The defendant, Coastal Lumber Company ("Coastal"), appeals from a judgment entered on a $400,000 general verdict in favor of the plaintiff, Michael L. Johnson, in this action seeking compensatory and punitive damages under Ala. Code 1975, §25-5-11.1, for wrongful termination of employment. We affirm.
Two issues are presented for our review:
 1) Whether the evidence was sufficient to submit the wrongful termination claim to the jury; and *Page 804 
 2) Whether Coastal was entitled to a new trial on the ground that Johnson's attorney had failed to disclose before the trial the name of an expert witness whom he intended to, and did, call to testify at the trial.
Coastal first contends that the evidence was insufficient to submit the wrongful termination claim to the jury and, therefore, that the trial court erred in denying its motions for a directed verdict and then later a judgment notwithstanding the verdict.
Coastal hired Johnson on August 28, 1992, as a "lumber puller" on the "green chain." This job involved removing lumber from a conveyor belt and stacking it. His immediate supervisor at that time was Ronald Mayo. Johnson injured his knee on September 3, 1992, and sought workers' compensation benefits. After missing several days of work, Johnson returned to work at Coastal, but, on his doctor's orders, he was on light-duty work. Johnson satisfactorily performed this work under supervisor Dale Goodman until September 15, 1992, when, 12 days after his injury, Coastal terminated his employment. Ronald Mayo and Coastal's plant manager, Joe Webb, noted in a "Report of Disciplinary Action" that Johnson's employment had been terminated because he had "[n]ot [been] performing [his] job duties very well" and that Johnson had been "making it hard on his fellow workers." That report also stated: "Termination due to unsatisfactory probationary period." Webb testified that Johnson had been fired because of poor job performance in connection with his work as a "lumber puller" on the "green chain."
Johnson testified, in part, as follows:
"Q. Were you off Friday, September 4?
"A. Yes, sir.
"Q. Were you off Monday, September 7?
 "A. Yes, sir. That Monday I called in and Mr. Goodman at the time was in the office. I relayed the message I would not be in, for him to give to my supervisor, Mr. Mayo. He said okay.
"Q. Why did you indicate you wouldn't be in?
 "A. I was still having problems with my knee. It was still swollen and painful.
 "Q. Tuesday was September 8th. Did you go to Coastal on Tuesday, September 8th?
"A. Yes, sir.
 "Q. Did you have a conversation there with Mr. Webb?
"A. Yes, sir.
 "Q. Tell me what you and Mr. Webb said to each other.
 "A. Mr. Webb said that he wanted me to go and punch the clock and sit down and don't do anything. I told Mr. Webb I would like to stay in compliance with the doctor's instructions, which were to come back and see him, and after seeing a doctor, I would be back to work. At that point Mr. Webb became upset and stated that didn't suit him.
 "Q. He got mad when you told him you wanted to go back and see the doctor?
"A. He became very upset.
". . . .
"Q. Go ahead.
 "A. At the same time — he eventually asked the secretary to make an appointment for me to see the doctor on the 9th, which I did go.
 "Q. Before we get to the 9th, did Mr. Webb offer you any kind of job there at Coastal Lumber Company reading gauges?
"A. No, sir.
 "Q. He said he just wanted you to punch the clock and sit down?
 "A. He said he wanted me to punch the clock, sit down, don't do anything.
"Q. Did he say why he wanted you to do that?
 "A. It was something pertaining about his insurance, he didn't want it to go up, which I didn't really understand it. So, I just told him I would like to comply with the doctor's instructions, you know, I will be back to work.
 "Q. Mr. Webb told you he didn't want his insurance to go up?
"A. Yes, sir.
"Q. He got mad during that conversation? *Page 805 
"A. He was upset.
 "Q. Did you go back to see the doctor on September 9?
"A. Yes, sir."
Johnson also testified that Ronald Mayo told him on September 15, 1992, that Coastal was "cutting back" and that he was not needed; that he was told two days later, on September 17, that he had been fired, but that his job performance was not mentioned at that time as a reason for his termination; and that he had never received any oral reprimands or warnings in connection with his performance as a "lumber puller." Although Webb testified that Coastal had terminated Johnson's employment because he had performed poorly as a "lumber puller" and that Coastal had made every attempt to keep good personnel records, no written reprimands or warnings appeared in Johnson's personnel file in connection with his job performance as either a "lumber puller" or as a light-duty laborer. In addition, Coastal's personnel records indicated that Johnson had been cited for unexcused absences on September 4, 7, 8, 9, 16, and 17, even though Johnson was off from work on September 4, 7, 8, and 9, because of his injury and even though he was not employed at Coastal on September 16 and 17.
Goodman, who had had no complaints about Johnson's performance of his light-duty tasks, testified as follows:
 "Q. In May of '92, did your employment with Coastal Lumber Company end?
"A. It did.
"Q. How did it end?
 "A. It is sort of a long story. The latter part of April, I broke my leg riding horses, and I had it operated on. I went back to work the following week and done my time cards the following week. I started going in in the morning, staying for two or three hours. They hired a new man. I got to asking around what his job was. No one told me. I went, asked Mr. Webb was my job in jeopardy because I broke my leg. He said if I broke it here it would. He said you broke it on your own time.
 "Q. You're talking about Mr. Joe Webb, seated at the edge of the defense table?
"A. That's correct.
 "Q. Mr. Webb told you if you broke your leg at the Coastal plant . . .
"A. That's correct.
"Q. . . . that he would have done what?
"A. He would [have] fired me.
". . . .
 "Q. When you worked at Coastal Lumber Company, did you know Michael Johnson?
"A. I did.
 "Q. Did you have occasion for Michael Johnson to work under you, under your supervision while you were employed at Coastal Lumber Company?
"A. That's correct.
 "Q. How would you classify the job that he had, as light duty, or heavy duty, or what?
"A. When he was working for me?
"Q. Yes, sir.
 "A. When he was working for me it was light duty.
". . . .
 "Q. I want to ask you, did he do his job satisfactorily while he was working light duty under your supervision at Coastal Lumber Company?
"A. He did.
 "Q. Did you have any complaint about him doing his job?
"A. No, sir.
". . . .
 "Q. All right. Coastal Lumber Company contends he was just an extra man over there [in his light-duty position], wasn't needed. I want to ask you in your opinion as his supervisor did you need him?
 "A. We could have needed him at that time. Like I say, we run two sometimes, run three, run as high as four.
"Q. At this time you were running three?
"A. At that time we were running three.
"Q. He was one of the three? *Page 806 
"A. Right.
". . . .
 "Q. When he was terminated on September 15, you were his supervisor. Did you terminate him?
"A. I did not.
 "Q. Prior to September 15, on or about September 8, were you privy to a conversation with Mr. Webb about terminating Michael Johnson?
"A. That's correct.
"Q. What did Mr. Webb say?
 "A. Him and Michael had had words in the parking lot. When he come in the office me and Ron Mayo were standing there. He said the day he was released from the doctor to regular duty, he said get the son of a bitch off the payroll. That's his exact words.
". . . .
 "Q. During the time he worked for you was Michael Johnson ever given any warning or criticism?
"A. Not by me he was not.
". . . .
"Q. Do you know why Michael Johnson was fired?
"A. Yes.
"Q. Why?
"A. Because he got hurt.
 "Q. Because he got hurt. Do you know of other incidents at Coastal Lumber Company where someone has been fired because they got hurt on the job?
 "A. Not necessarily fired. They was intended to be fired for getting hurt. I have had people got hurt working under me, first thing [Webb] says is fire him, but you can't do that. One boy mashed his finger off, come to work the next day with a sweatsuit on. He said you're going to get rid of him if he is going to come dressed like he's playing basketball.
". . . .
 "Q. During the time you worked at Coastal Lumber Company, were there ever any occasions when you were asked to, for lack of a better word, doctor or falsify records to justify something?
 "A. Not really to falsify. [Webb] always stayed after us hard to keep paperwork on being late, absentee, where somebody we did fire them they would have documentation [so that if] they try to draw their pennies they couldn't.
 "Q. Let me ask you, with regard to that, about a man drawing the pennies. Y'all ever [asked] to doctor a record [to] keep somebody from drawing his pennies?
 "A. I went [and] backdated some stuff [when] the guy [who] was out wasn't wrote up at that time.
 "Q. A guy applied for his pennies, wasn't anything in his records at that time, after he applied, you were asked by Mr. Webb to go back and doctor those records?
". . . .
 "A. I don't want to say I was asked by Mr. Webb to. I doctored the papers. I know how he was as far as us keeping our paperwork up. I mean, I don't want to say Mr. Webb said you need to doctor the papers up because of that, no.
 "Q. Do you know whether or not the reason for firing somebody getting hurt was to threaten or [to] intimidate other workers out there?
"A. I would say to set an example.
"Q. To make an example out of somebody?
"A. Yep, that's correct."
Mayo also testified:
 "Q. Now, Michael Johnson was not fired before he got hurt, was he?
"A. No, sir.
 "Q. And you have talked about what the handbook at Coastal requires?
"A. Uh-huh.
 "Q. And you said when you gave him or talked with him orally, that was pursuant to the handbook; is that right?
"A. That's correct.
 "Q. Does Coastal have a progressive discipline policy?
"A. Yes, sir, they do.
 "Q. Let me show you in the handbook what purports to be the progressive discipline policy at Coastal Lumber Company. Does this say company policy provides for *Page 807 
the application of [a] progressive discipline system to permit fair and consistent exercise of disciplinary policy for violation of plant rules and regulations; is that what that says?
"A. Yes, sir, it does.
"Q. Then it has the procedure?
"A. Uh-huh.
 "Q. And on the first offense it says oral reprimand, correct?
"A. Correct.
 "Q. Then it provides for a second offense, doesn't it?
"A. Yes, sir, it does.
 "Q. It says written reprimand on the second offense, doesn't it?
"A. Yes, sir.
". . . .
 "Q. As far as the third offense, there is no third offense, there was never any written warning, final warning, was it?
"A. No, sir.
 "Q. Y'all jumped from what you call an oral reprimand, after a man had been there two or three days, to firing him on the 15th, when he was satisfactorily doing his light-duty job.
 "A. But [Dale Goodman] already had a full crew over there. We couldn't let somebody go over there to put him to work.
 "Q. Do you agree with this, that sometimes on that stacker there would be two men stacking, sometimes three, sometimes four?
"A. Not four.
 "Q. Mr. Goodman testified on occasion when y'all would be backed up he has even had four men over there, you don't recall that?
"A. No, sir.
"Q. Do recall three, don't you?
"A. Yes, sir, I do.
"Q. Michael was one of the three men, right?
 "A. One of the three until we found another place to put a man.
". . . .
 "Q. You see the problem I'm having with your testimony is that you come in here now and say he was fired for not doing the job properly on the green chain.
"A. Right.
 "Q. And logically, I think, well, if he was going to be fired for not doing the job on the green chain, that would have occurred while he was on the green chain, it just makes sense, right?
"A. (nods head)
 "Q. You would have gone over to him, said, 'You can't do the job, you're fired.' That didn't occur while he was on the green chain?
"A. No, sir.
 "Q. He got hurt on the green chain, and then after he comes back on light duty, not ever getting back over there under you, yet he gets fired, right?
"A. Right.
 "Q. And you come in here still working for a lumber company, and you testify about having counseled with him and giving him an oral reprimand.
"A. Yes, sir.
 "Q. There is no evidence of it. I'm looking at [your] forms. You see what I'm saying?
"A. Yes, sir.
 "Q. Then how is an employee to be treated fairly if you come in, say, well, paperwork don't mean nothing. It either does or doesn't. When we're going by the handbook on the ninety-day, ninety-day probationary period that [your] lawyer introduced, it meant a lot then, right?
"A. Yes, sir."
In addition, Webb testified as follows:
 "Q. I want you to go with me when I look at Mr. [Derrick] Boyd's termination records. There are one, two, three, four absentee memos. Do you agree with that?
"A. Yes, sir.
 "Q. In other words, on September 15, 1990, there is an absentee memo, Mr. Boyd didn't show up for work, right?
"A. Correct.
"Q. He didn't get fired for that?
"A. One day, no, sir, he didn't. *Page 808 
 "Q. On September 25, ten days later you have got on here, AWOL, Mr. Boyd didn't show up for work?
"A. Correct. The supervisor wrote that up.
"Q. He didn't get fired for that, did he?
"A. No, sir.
"Q. That the second time?
"A. Second absenteeism.
 "Q. Then again on October 8, 1990, another absenteeism memo, again AWOL?
"A. Yes, sir.
"Q. He was absent without permission, wasn't he?
"A. Correct. According to the form he was.
 "Q. And finally after the third incident he got fired.
"A. Absenteeism.
 "Q. The thing I also noticed about this, it is documented. You have documentation, your lawyer presented it, and you have testified to it to the jury?
"A. Yes, sir.
 "Q. Can you account for why if that is the policy of Coastal Lumber Company you do not have documentation on Michael Johnson?
 "A. This particular incident, those involved absenteeism, a form the supervisor and secretary fill out.
 "Q. You and I both know that there are many and varied forms of employees not fulfilling responsibilities.
"A. Yes, sir, unfortunately.
 "Q. Would you agree with me it is important, equally important, no matter what, that particular failure to perform a responsibility, is that you document it, would you agree with that?
 "A. In most incidences, yes, sir. That does not rule out the fact [of] oral warnings. And in the case of Mr. Johnson, does not rule what we did was wrong in his case in any means.
". . . .
 "Q. I would like to ask you about this handbook. I want you to show me in your handbook the paragraph where it says that a probationary employee is not entitled to have progressive discipline.
"A. It does not say that.
 "Q. Well, isn't that what you give new employees that come to work at Coastal Lumber Company?
 "A. Yes, sir. It also says in here that there are other reasons to terminate people. It's not exclusive of that progressive discipline process. Management or supervision can make a decision out of this disciplinary process.
"Q. That's your handbook, correct?
"A. Yes, sir.
"Q. You give it out to employees, correct?
"A. Correct.
 "Q. It provides for progressive discipline, correct?
"A. Correct.
 "Q. Progressive discipline is an oral warning, a written reprimand, a written reprimand and then termination on the fourth time, right?
"A. In that paragraph that's what it is.
 "Q. You said a minute ago that Coastal Lumber Company didn't fall — let me get your exact words. I think you said not normally. Coastal Lumber Company does not normally use progressive discipline with regard to probationary employees.
 "A. If it is determined by supervision that the employee is not going to work out, that it's not salvageable, a change has to be made, we're not going to go through oral and three written warnings, we're going to make a decision and terminate him."
In Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1121-23
(Ala. 1992), this Court stated:
 "Under Alabama law, an employment contract is generally terminable at will by either party, with or without cause or justification — for a good reason, a wrong reason, or no reason at all. Hoffman-LaRoche, Inc. v. Campbell, 512 So.2d 725
(Ala. 1987). However, with regard to dismissals based on the filing of workers' compensation claims, the legislature has carved out an exception to this general *Page 809 
rule. See § 25-5-11.1, Ala. Code 1975, and McClain v. Birmingham Coca-Cola Bottling Co., 578 So.2d 1299 (Ala. 1991).
"Section 25-5-11.1 provides:
 " 'No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety rule pursuant to subdivision (c)(4) of § 25-5-11.'
 "In Twilley v. Daubert Coated Products, Inc., 536 So.2d 1364 (Ala. 1988), this Court interpreted this retaliatory discharge statute as it regards the prohibition against discharging an employee 'solely' because the employee has made a workers' compensation claim. The Court stated the following test:
 " 'We hold that an employee may establish a prima facie case of retaliatory discharge by proving that he was "terminated" because he sought to recover workers' compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the employee must prove that the reason given by the employer was not true but a pretext for an otherwise impermissible termination.'
 "Twilley, 536 So.2d at 1369. We note that it would be more appropriate to say that, after the defendant has met his burden of coming forward with evidence of a legitimate reason, ' "[t]he plaintiff then has the burden of going forward with rebuttal evidence showing that the defendant's [stated] reasons" ' for terminating the plaintiff are not true. Twilley, 536 So.2d at 1369, quoting Pushkin v. Regents of the University of Colorado, 658 F.2d 1372, 1387 (10th Cir. 1981). The plaintiff does not have to 'prove' that the employer's stated reason is not true unless the defendant's evidence is sufficiently certain, without more evidence from the plaintiff, to support a directed verdict. If the plaintiff's prima facie case is strong, and the defendant's evidence of an asserted reason is weak or equivocal, the jury might simply disbelieve the defendant.
". . . .
 "Alabama's workers' compensation laws should be liberally construed in favor of the employee in order to advance and effectuate the beneficent purposes. Hilyard Drilling Co. v. Janes, 462 So.2d 942 (Ala.Civ.App. 1985). If we were to say that, as a matter of law, the reason given by [the employer] is a conclusively legitimate reason, the beneficent purposes of § 12-5-11.1 would be significantly undermined. An employer could almost always say either 'we hired someone to take your place,' or 'we no longer have enough business to continue your employment.' Thus, we think a jury question is presented as to whether [the employer's] asserted reason is a legitimate one or only a pretext.
 "Furthermore, [the employer's] failure to immediately give this reason to [the plaintiff], together with the 'ten or fifteen minute' private conference with James Wade, whose position with [the employer] is not disclosed in the record, is sufficient circumstantial evidence from which a jury might be allowed to infer that [the employer] fabricated the asserted reason."
After carefully examining the record and reviewing the evidence in the light most favorable to Johnson, as we must do in reviewing a ruling on a motion for a directed verdict or for a judgment notwithstanding the verdict, see Sears, Roebuck Co. v. Harris, 630 So.2d 1018 (Ala. 1993), cert. denied,___ U.S. ___, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994), we conclude that the evidence was sufficient to submit the wrongful termination claim to the jury. The evidence showed that Coastal terminated Johnson's employment shortly after he injured his knee and sought workers' compensation benefits and under circumstances suggesting that the termination was in response to Johnson's having sought workers' compensation benefits. The legitimacy of Coastal's stated reason for terminating Johnson's employment — that he had performed poorly as a "lumber puller" on the "green chain" — was *Page 810 
hotly contested at the trial. Coastal contended that Johnson's employment had been terminated because of poor job performance, yet Coastal's personnel records did not reflect that Johnson had received any written reprimands or warnings in accordance with Coastal's "progressive discipline policy." Coastal presented testimony that Johnson had been orally reprimanded; Johnson testified that he had received no oral reprimands. Johnson testified that he was first informed that he had been laid off as a result of Coastal's "cutting back" on the number of its employees, only to be told later that he had been fired. This Court has held that an employer is not entitled to a judgment as a matter of law by merely presenting evidence suggesting, but not conclusively showing, that it had a legitimate reason for terminating an employee.Culbreth, supra, at 1123. The testimony in this case presented credibility issues for the jury. We hold that the evidence was sufficient for the trial court to submit Johnson's wrongful termination claim to the jury.
Coastal also contends that the trial court erred in denying its motion for a new trial on the ground that Johnson was permitted to present the testimony of an expert witness whom he had failed to identify before the trial. The record indicates that Johnson filed his complaint on December 3, 1992. As previously noted, one count in the complaint sought damages based on allegations of wrongful termination of employment; however, Johnson also included another count seeking workers' compensation benefits. Coastal, represented by Jon A. Green of the law firm of Crosby, Saad, Beebe, Cavender, and Crump, P.C., filed its answer on January 15, 1993. At the same time, Coastal propounded interrogatories to Johnson, one of which (number 11) requested that Johnson identify the expert witnesses he expected to call to testify at the trial. Although some of these interrogatories sought information relevant to both claims, most of them sought information regarding the nature and cause of the accident and resulting injury, information that, at least arguably, was relevant primarily with respect to the workers' compensation claim.
On January 29, 1993, Jonathan S. Harbuck of the law firm of Kullman, Inmon, Bee, Downing, and Banta, P.C., filed a "Notice of Appearance and Amendment to Answer"; that document stated, in pertinent part:
 "Comes now the undersigned and enters his appearance as counsel of record for defendant Coastal Lumber Company, as to the allegations contained in paragraphs 1-7 of plaintiff's second cause of action [the wrongful termination claim]."
Thereafter, Johnson timely responded to the interrogatories that had been propounded by Mr. Green, specifically responding to interrogatory number 11 as follows: "Unknown at this time. Plaintiff reserves the right to supplement this response." The certificate of service attached to Johnson's answers to the interrogatories shows that they were served only on Mr. Green. The record does not indicate that Mr. Harbuck propounded any interrogatories to Johnson with respect to the wrongful termination claim. Johnson's claims were separated for purposes of trial. At the trial of the wrongful termination claim, Johnson called Thomas H. Christiansen, a licensed professional counselor specializing in vocational rehabilitation, to testify on his behalf. Coastal objected to Christiansen's testifying; however, it did not request a continuance for purposes of deposing him or in order to secure its own expert witness to testify in rebuttal. The trial court allowed Christiansen to testify; Coastal claims that the result was an inability on its part to rebut his testimony.
Coastal's basic contention is that Johnson had an absolute duty under Rule 26(e)(1)(B), Ala.R.Civ.P., to supplement his response to interrogatory number 11 before the trial on the wrongful termination claim and that Coastal had a right to rely on that supplementation being made. Coastal argues that the trial court abused its discretion in not excluding Christiansen's testimony. Johnson contends that the trial court, considering all of the circumstances, did not abuse its discretion in allowing Christiansen to testify. Johnson argues that he was under no obligation to disclose the identity of the expert witnesses he expected to call to testify at the trial of the wrongful termination claim, because, *Page 811 
he says, no discovery request for that information had been propounded to him by Mr. Harbuck. He maintains that the interrogatories propounded by Mr. Green dealt only with the workers' compensation claim.
After carefully reviewing the record and considering the circumstances underlying this issue, we cannot hold that the trial court erred in ruling as it did on Coastal's motion to exclude. This Court remains committed to the following policy regarding discovery:
 " 'Generally speaking, the purpose of modern discovery is to assist the administration of justice, to aid a party in preparing and presenting his case or his defense, to advance the function of a trial in ascertaining truth, and to accelerate the disposition of suits. Beyond this, the rules for discovery are designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments be rested upon the real merits of cases and not upon the skill and maneuvering of counsel.' 23 Am.Jur.2d, Depositions and Discovery, § 155 (1956). Stated otherwise, the rules seek to 'make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.' United States v. Procter Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)."
Ex parte Dorsey Trailers, Inc., 397 So.2d 98, 103 (Ala. 1981). In furtherance of this policy, we have consistently recognized that the admission of testimony from witnesses whose identity may not have been disclosed in accordance with properly conducted pretrial discovery procedure is within the trial court's sound discretion. Absent palpable abuse of that discretion, the trial court's decision will not be disturbed on appeal. Crane v. Rush, 577 So.2d 851 (Ala. 1991). This Court has also demonstrated a general reluctance to reverse in this kind of case in the absence of an intent on the part of a party to conceal the identity of expert witnesses expected to be called to testify at trial. See, e.g., Alabama Power Co. v.Courtney, 539 So.2d 170 (Ala. 1988); Phillips Colleges ofAlabama v. Lester, 622 So.2d 308 (Ala. 1993). The record here indicates that Mr. Green, on Coastal's behalf, initially filed an answer directed toward both counts of Johnson's complaint and that he propounded interrogatories at the same time that, at least on their face, were directed toward both the workers' compensation claim and the wrongful termination claim. However, shortly thereafter, Mr. Harbuck filed his notice of appearance in the case and immediately took sole responsibility for defending Coastal with respect to the wrongful termination claim. Mr. Harbuck apparently did not propound any interrogatories of his own seeking the identity of Johnson's expert witnesses. The trial court could have reasonably concluded that Johnson's attorney associated Mr. Green's initial interrogatories, including interrogatory number 11, with the workers' compensation claim and that, because he had received no request for disclosure of expert witnesses from Mr. Harbuck, Johnson's attorney did not realize that he was obligated under Rule 26 to supplement his answer to interrogatory number 11. Stated differently, the trial court could have found that Johnson's attorney did not knowingly conceal Christiansen's identity for the purpose of "ambushing" Coastal at the trial. On the question of prejudice, the record reveals, and Coastal acknowledges in its brief, that Christiansen's name first came up during voir dire examination, before the jury was selected and empaneled. Later, before Johnson presented his case, Coastal objected to the admission of Christiansen's testimony; however, it did not seek a continuance of the trial for purposes of deposing Christiansen or obtaining a rebuttal witness. Coastal's failure to request a continuance could have suggested to the trial court that Coastal was satisfied that through cross-examination it could discredit Christiansen's testimony.
We agree with Coastal that under Rule 26(b)(4)(A), a party's attorney has the right, generally, to rely on an adverse party's answers to interrogatories, to determine the identity of any expert witness expected to be called to testify at trial, as well as "the subject matter on which the expert is expected to testify," and "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." We also agree that when *Page 812 
interrogatories are used to discover information about experts who will testify at trial, the answering party has a duty under Rule 26(e)(1)(B) to supplement his response to the questions if the identity of the expert and information about the substance of the expert's testimony are not known when the interrogatories are answered. See Coca-Cola Bottling Co.United, Inc. v. Stripling, 622 So.2d 882 (Ala. 1993). However, the particular facts in this case (the fact that Coastal was being represented by two different law firms, the absence of a knowing concealment on the part of Johnson's attorney, and the fact that Coastal's attorney did not request a continuance of the trial) militate against a finding that the trial court abused its discretion in allowing Christiansen to testify.
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
ALMON, SHORES, INGRAM, COOK, and BUTTS, JJ., concur.