[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 317 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 318 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 319 
Robert Ray Edwards appeals from a judgment in favor of John Roger Valentine and his wife, Tina Valentine, in their action against Edwards alleging the negligent entrustment of an automobile. We affirm.
On May 31, 2002, John Valentine was injured when the automobile he was driving was struck from behind by a pickup truck operated by Michael Garrison, an unlicensed driver. The truck Garrison was driving belonged to Edwards. Valentine sued Edwards,[1]
alleging that he had negligently or wantonly entrusted his vehicle to Garrison. The complaint included a loss-of-consortium claim asserted by Tina Valentine. After a nonjury trial, the trial court — without making specific findings of fact — awarded John $115,000 in compensatory damages and awarded Tina $35,000 on the loss-of-consortium claim. The trial court denied Edwards's motion to alter, amend, or vacate the judgment, and Edwards timely appealed.
On appeal, Edwards challenges the sufficiency of the evidence of negligent entrustment and the amount of the judgment. He also challenges the admission of a computer printout of a "Law Enforcement Tactical System" ("LETS") report, which purported to represent Garrison's driving history.[2] Additionally, he challenges the testimony of Dr. Guy W. Walker, a vocational expert who testified for the Valentines, as one who was "not disclosed by the Valentines in their responses to Mr. Edwards' discovery requests as to expert witnesses." Edwards's brief, at 51.
 I. Negligent Entrustment
This Court has adopted Restatement (Second) of Torts § 390 (1965) as the *Page 320 
law of this State in cases involving negligent entrustment.Keller v. Kiedinger, 389 So.2d 129, 132 (Ala. 1980). According to § 390,
 "[o]ne who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."
Otherwise stated, "`[t]he essential ingredients of a cause of action for negligent entrustment are: (1) an entrustment; (2) to an incompetent; (3) with knowledge that he is incompetent; (4) proximate cause; and (5) damages.'" Halford v. Alamo Rent-A-Car,LLC, 921 So.2d 409, 412 (Ala. 2005) (quoting Mason v. New,475 So.2d 854, 856 (Ala. 1985) (emphasis omitted)). Edwards challenges the sufficiency of the sharply disputed evidence of each of these elements.
 A. Entrustment
Edwards first contends that the trial court erroneously found that he had entrusted his vehicle to Garrison on the date of the accident. When the trial court hears ore tenus testimony, as this one did, "`its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.'" New Props., L.L.C. v. Stewart, 905 So.2d 797, 799
(Ala. 2004) (quoting Philpot v. State, 843 So.2d 122, 125 (Ala. 2002)).
 "Moreover, when a trial court makes no specific findings of fact, `this Court will assume that the trial judge made those findings necessary to support the judgment.' Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala. 1992). Under the ore tenus rule, `"appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence."' Yates v. El Bethel Primitive Baptist Church, 847 So.2d 331, 345 (Ala. 2002) (quoting Ex parte Pielach, 681 So.2d 154, 155 (Ala. 1996))."
Stewart, 905 So.2d at 799.
"In Alabama, when one person drives a car belonging to another, a rebuttable presumption of entrustment, i.e., that the car was being operated by the driver with the permission of the owner,arises when ownership is established. . . . Thus, the owner of a vehicle is faced with a substantial burden in order to disprove an entrustment." Note, Negligent Entrustment in Alabama, 23 Ala. L.Rev. 733, 738 (Summer 1971) (emphasis added; footnote omitted); see also Thompson v. Havard, 285 Ala. 718, 721,235 So.2d 853, 856 (1970). "Entrustment can include either [1] actual entrustment, [2] continuing consent to use the vehicle, or [3] leaving the vehicle available for use." Note, supra, at 738. A case of entrustment by "leaving the vehicle available" may occur, even though "the entrustor has not given . . . permission [to use the vehicle on a particular occasion] and may even haveexpressly refused it." Id. at 739 (emphasis added; footnote omitted). "In order to establish that there has been an entrustment by leaving the vehicle available, it must be shown that the entrustor knew or had reason to know that the particular incompetent involved in the accident was likely to use thevehicle without authorization and that the entrustor failed totake reasonable precautions to prevent such unauthorized use."Id. (emphasis added; footnote *Page 321 
omitted); see also Redmond v. Self, 265 Ala. 155, 90 So.2d 238
(1956); Paschall v. Sharp, 215 Ala. 304, 110 So. 387 (1926). In this case, the evidence was sufficient for the court to conclude that Edwards left the vehicle available for Garrison's use on the date of the accident.
At the time of the accident, Garrison was married to Edwards's sister. The Garrisons and Edwards had lived in adjacent mobile homes for approximately 10 years before the accident. Edwards testified that he "left" his truck for Garrison's wife, who had "four small children," to use "in case of an emergency." Garrison testified that he took the truck on the day of the accident "to go to the feed store." The keys were not in the truck, so Garrison entered Edwards's home and got the keys from "the dresser or the table," as he had occasionally done in the past.
The parties stipulated to the admission of the deposition of Billy Ray Cochran, who testified that he had seen Garrison driving Edwards's truck on occasions before the accident. He also stated that, on numerous occasions — both before and after the accident — he had seen Edwards give Garrison the keys to Edwards's truck, accompanied by the instructions that if Garrison, his wife, or one of their children "ever ha[d] a wreck in it, [they should claim that they] stole th[e] truck." John Valentine testified that Cochran had repeated that account to him. Additionally, John Valentine testified that he personally had seen Garrison driving Edwards's truck on numerous occasions before the accident.
These allegations were disputed by Edwards and Garrison. However, it is the function of the trial court, when acting as the finder of fact, to weigh the credibility of witnesses.Stephens v. State, 50 Ala.App. 244, 246, 278 So.2d 245, 247
(Crim.App. 1973). The trial court's conclusion that Edwards entrusted his vehicle to Garrison is not palpably erroneous.
 B. Incompetence of Operator
"A further element of negligent entrustment is the necessity of proving that the operator of the vehicle was an incompetent or reckless person." Note, supra, at 740. "`Incompetence' comprehends various kinds of unfitness. . . ." Rush v.McDonnell, 214 Ala. 47, 51, 106 So. 175, 178 (1925).
 "`[I]ncompetence is not confined to downright inability to perform the allotted service. It goes to reliability in all that is essential to make up a reasonably safe person, considering the nature of the work, and the general safety of those . . . [. . . who will be in the line of danger from the operations with which the person is intrusted].'"
214 Ala. at 51, 106 So. at 178-79 (quoting 18 R.C.L. 726 § 204) (emphasis added).
Similarly, Restatement (Second) of Torts § 390 cmt. b (1965) states, in pertinent part:
 "[O]ne who supplies a chattel for the use of another who knows its exact character and condition is not entitled to assume that the other will use it safely if the supplier knows or has reason to know that such other is likely to use it dangerously, as where the other belongs to a class which is notoriously incompetent to use the chattel safely, or lacks the training and experience necessary for such use, or the supplier knows that the other has on other occasions so acted that the supplier should realize that the chattel is likely to be dangerously used, or that the other, though otherwise capable of using the chattel safely, has a propensity or fixed purpose to misuse it."
(Emphasis added.)
Thus, the plaintiff alleging negligent entrustment may show that the driver *Page 322 
to whom the defendant entrusted the vehicle was "unable or unlikely to have operated the motor vehicle with reasonable safety due to one of several characteristics or conditions," including "general incompetence" or "habitual negligence." Note, supra, at 740 (footnote omitted). More specifically, proof may "be established by evidence of previous acts of negligent orreckless driving, . . . previous accidents, or previous acts ofdriving while intoxicated." Id. at 746 (emphasis added; footnotes omitted).
Garrison has not possessed a valid driver's license since 1980. He testified that his Alabama license expired while he was residing in Illinois; that he had refused to obtain an Illinois license; and that, after returning to Alabama, he had been "trying to get [his] license back" for two years before the accident. The trial court admitted evidence of Garrison's driving history, which included eight convictions for driving while his license was suspended or revoked.
Edwards testified that, approximately three years before this accident, Garrison had "broadsided a lady" while driving another of Edwards's vehicles. Although Garrison testified that the earlier accident was not his fault, Edwards testified that it wasbecause of that earlier accident that he refused to allow Garrison to drive his vehicles.
Garrison's driving record also contained a 1986 conviction for driving under the influence of alcohol or a controlled substance ("DUI") and a second such conviction in 1998. In this connection, Valentine testified that immediately after the accident Garrison asked him not to notify law-enforcement authorities of the accident, because, according to Garrison, he "didn't have [a] license and he had been doing some downers, and he didn't want to go to jail." (Emphasis added.) Indeed, Edwards testified that, "[b]ack at the time of the accident," Garrison was "drink[ing] a lot." Our cases support a finding of incompetence based on this evidence.
It is well stated "that one who is an habitual drunkard is an incompetent driver." McGowin v. Howard, 251 Ala. 204, 208,36 So.2d 323, 325 (1948). The extent to which two instances of driving while intoxicated support a finding of incompetence for purposes of a negligent-entrustment claim was the question addressed in Redmond v. Self, 265 Ala. 155, 90 So.2d 238
(1956). That case arose out of an accident that occurred on May 10, 1952, in Birmingham. 265 Ala. at 158, 90 So.2d at 240. Ruby Self was injured when the automobile in which she was riding was struck by an automobile operated by Terrell Mills. At the time of the accident, Mills was employed by C. Bryan Redmond, an individual "engaged in the business of selling new and used automobiles in the city of Knoxville, Tennessee."265 Ala. at 158, 90 So.2d at 240. "At the time of the collision Mills was under the influence of an intoxicating liquor or beverage." Id.
He was "not acting within the line and scope of his employment,"id., and, indeed, had taken the automobile from Redmond's car lot without Redmond's knowledge and contrary to Redmond's express instructions. 265 Ala. at 159, 90 So.2d at 241. Self sued Redmond, averring that he "negligently entrusted the automobile to Mills, an incompetent driver who was addicted to the use of intoxicating liquors or beverages, although [Redmond] knew Mills to be an incompetent driver and knew that he was addicted to the use of intoxicating liquors or beverages." 265 Ala. at 158,90 So.2d at 241.
A jury trial of the case produced the following pertinent facts:
 "Mills was first employed by Redmond early in March, 1952, as a new and *Page 323 
used car salesman and was authorized by Redmond to drive the latter's automobiles for demonstration purposes, but for no other purpose, this according to Redmond's testimony. But irrespective of that restriction on the use of his employer's automobiles, Mills on or about April 1, 1952, drove a Redmond automobile to the town of Clinton, Tennessee, approximately twenty miles away from Knoxville, where he was arrested on a charge of driving while intoxicated. The trip to Clinton was not on company business. Because of this episode Mills was fired but was reemployed by Redmond three or four days thereafter, with the understanding, according to Redmond, that Mills could not drive a Redmond-owned automobile from the place of business without instructions from the used car manager. As heretofore indicated, on the day of the accident here involved, Mills had no such instruction from the used car manager or anyone else in authority. W.W. Self, the husband of [the plaintiff], testified that in a conversation which he had with Redmond several months after the accident the latter stated that after Mills was reemployed he had access to the automobiles like other salesmen."
265 Ala. at 159, 90 So.2d at 241 (emphasis added). In addition, Redmond allegedly told Self's husband "that before May 10, 1952,he knew that Mills was a `drunkard' but that he was a good salesman except for his driving and had conducted himself properly during the time that intervened between the Clinton trip and the Birmingham trip." 265 Ala. at 159, 90 So.2d at 242
(emphasis added).
The trial court entered a judgment on a jury verdict in favor of Self, and this Court affirmed, holding that "the evidence [was] sufficient to support a finding by the jury that Mills was addicted to the use of intoxicating liquors or beverages and that Redmond had knowledge of that addiction." 265 Ala. at 159,90 So.2d at 241. In doing so, it explained:
 "It is true that the evidence does show but two specific instances when Mills was drunk, one on the Clinton trip and the other on the visit to Birmingham which resulted in this litigation. Of course, the Birmingham incident cannot be considered in connection with the charge that Redmond knew of Mills' addiction and nevertheless entrusted the automobile to him. But that instance is to be considered as going to show Mills' addiction as charged in connection with the evidence concerning his drunkenness in Clinton. . . ."
265 Ala. at 159, 90 So.2d at 242 (emphasis added). In short, proof of the incompetence element was based on two instances of driving while intoxicated — one of which was the accident itself — and the testimony of the entrustor that the entrustee was a "drunkard."
There was credible evidence in this case that Garrison had been involved in three instances of driving under the influence of alcohol or a controlled substance — including the accident itself. Similarly, Edwards testified, as did the entrustor inRedmond, that at the relevant times, Garrison was known to "drink a lot." Thus, the evidence of prior instances of substance abuse in this case exceeds that in Redmond. Additionally, there are other indicia of incompetence in this case, such as Garrison's apparent inability to obtain a driver's license and the prior automobile accident that occurred when Garrison was driving one of Edwards's vehicles.
It is well established that the mere nonpossession of a valid driver's license is not evidence of incompetence in the context of negligent entrustment. See Halford v. Alamo Rent-A-Car, *Page 324 
921 So.2d at 417 ("[e]vidence of the suspension of one's driver's license for failure to discharge a citation for a nonmoving violation is not substantial evidence, standing alone, of incompetence to operate a vehicle"); Day v. Williams, 670 So.2d 914, 916 (Ala. 1995) (entrustee's "competence as a driver does not hinge upon the existence or nonexistence of a driver's license in his name"); Giles v. Gardner, 287 Ala. 166, 170, 249 So.2d 824, 827
(1971) ("The existence or non-existence of a driver's license does not establish the competency or incompetency of a driver.").
There are instances, however, where evidence indicating the absence of a driver's license may be probative of incompetence in a negligent-entrustment case. See, for example, Mason,475 So.2d at 856, where it was held that evidence that an entrustee had no driver's license because she had "failed her driver's test three times and had no license at the time of the accident was probative of her incompetency." In other words, where the absence of a license is causally connected to the absence of driving ability, the evidence is entitled to some weight.
In this case, Garrison testified that his Alabama driver's license had expired while he was residing in Illinois, and he had declined to obtain an Illinois driver's license. It is undisputed, however, that Garrison had lived in Alabama for at least 10 years before the accident and had never reacquired an Alabama license. In fact, according to Garrison, he had been "trying to get [his] license back" for two years before the accident. (Emphasis added.) Although Garrison did not specify what circumstances had impeded his reacquiring an Alabama driver's license, it is reasonable to infer that the inability of an adult Alabama resident to acquire a driver's license after "trying" for two years is causally related to his or her competency as a driver.
An additional factor bearing on this element of the negligent-entrustment claim is the evidence of Garrison's prior accident while driving one of Edwards's vehicles. One prior accident, standing alone, is not substantial evidence of incompetence. See Thedford v. Payne, 813 So.2d 905
(Ala.Civ.App. 2001). In this case, however, Edwards's testimony that Garrison had previously "broadsided a lady" could be considered by the trial court in conjunction with Edwards's testimony that the prior accident was the basis for his refusalto allow Garrison to drive the vehicle that struck Valentine's vehicle. This testimony indicates that Edwards himself considered Garrison an unreliable operator of a vehicle. See Tanis v.Eding, 274 Mich. 288, 294, 264 N.W. 375, 377 (1936) (testimony of the defendant entrustor that the entrustee "was a reckless . . . driver" was evidence of the entrustee's incompetence precluding a directed verdict or a judgment non obstante veredicto). Considering all the facts and circumstances of this case, we cannot conclude that the judgment based on the trial court's finding of incompetency was palpably erroneous or manifestly unjust.
 C. Knowledge of Incompetence
Edwards argues that "[t]he Valentines have not met the burden of proving that Mr. Edwards knew, or should have known, of the alleged incompetence of Mr. Garrison." Edwards's brief, at 31. This argument is particularly unpersuasive in view of Edwards's trial testimony that he forbade Garrison's use of his truckbecause of Garrison's past driving performance. Of course, as noted above, Edwards knew that at the time of the accident Garrison was "drink[ing] a lot." Moreover, Edwards admitted that he knew of Garrison's *Page 325 
1998 DUI conviction and knew that Garrison was unlicensed. See also Tanis, 274 Mich. at 294, 264 N.W. at 377 (testimony of the defendant entrustor that the entrustee "was a reckless . . . driver" was evidence of the entrustor's knowledge of the entrustee's incompetence). This argument is, therefore, without merit.
 D. Proximate Cause
Edwards next contends that "[t]here is insufficient evidence to prove that the alleged harm to Mr. Valentine was proximately caused by the alleged negligent entrustment." Edwards's brief, at 36. We disagree.
Under our negligent-entrustment cases, "the entrustor's liability for such entrustment [of a vehicle] depends upon an injury proximately resulting from the incompetency of the entrustee." Bonds v. Busler, 449 So.2d 244, 245 (Ala.Civ.App. 1984).
 "Such incompetence [of the driver in the operation of the vehicle] may be manifested by active culpable negligence of the driver or it may be manifested by non-culpable, passive inability to function as a driver. Except in the latter instance, the liability of the entrustor must rest upon a consideration of the conduct of the bailee to establish the necessary element of incompetency as a proximate cause of injury."
449 So.2d at 245.
It is undisputed that the vehicle Garrison was driving collided with the vehicle Valentine was driving because Garrison was not watching the road. There was credible evidence indicating that Garrison was operating the vehicle while he was under the influence of a controlled substance. Indeed, during oral argument on the motion for a new trial, Edwards's counsel conceded that "there was evidence" indicating that Garrison was negligent — even wanton — in the operation of Edwards's vehicle. In short, the evidence was sufficient to prove that the accident resulted from negligent entrustment.
 E. Damages
Edwards contends that the "damages award is excessive and unsupported by the evidence." Edwards's brief, at 40. We disagree.
The ore tenus standard of review extends to the trial court's assessment of damages. "It is a settled principle of Alabama appellate jurisprudence that the findings of a trial court as to the amount of damages, where evidence has been presented oretenus or partly so, will not be disturbed on appeal in the absence of an abuse of discretion." Freeman Wrecking Co. v. Cityof Prichard, 530 So.2d 235, 237 (Ala. 1988). See also Robinsonv. Morse, 352 So.2d 1355, 1357 (Ala. 1977) ("Where evidence as to amount of damages was heard ore tenus by the trial judge, his findings should be reversed only if clearly and palpably erroneous."). "When a trial court makes no specific findings of fact, [the appellate] court will assume that it made those findings necessary to support its judgment `unless such findings would be clearly erroneous.'" Aratex Servs., Inc. v. Stan MesserStores, Inc., 637 So.2d 1351, 1353 (Ala.Civ.App. 1994) (quotingWard v. State, 592 So.2d 581, 582 (Ala. 1992)). Moreover, "[o]n review of an award of damages following ore tenus proceedings, there is no requirement that the appellate court be able to determine precisely how the trial court calculated the amount awarded." 637 So.2d at 1353; see Alford v. Jones, 531 So.2d 659
(Ala. 1988).
The damages awarded in this case were based on the oral testimony of the Valentines and their occupational expert, Dr. Guy Walker, as well as the deposition *Page 326 
testimony of Dr. Todd Smith, John Valentine's orthopedic surgeon. Valentine testified that he has suffered constant back pain since the accident, which, according to Dr. Smith, caused Valentine to suffer lumbar and cervical strains. Following an examination of Valentine on March 26, 2003, Dr. Smith signed a "work status form" restricting Valentine to "sedentary" work. Approximately two months later, Valentine's employment was terminated.[3]
Dr. Walker testified that Valentine, who was 39 years old at the time of the trial, was, because of his injuries and educational status, essentially "unable to perform any type of employment." Also, according to Dr. Walker and Tina Valentine, Valentine has suffered from anger, irritability, and depression as a result of his injuries, which have adversely affected his relationships with his wife and young daughter. The trial court made no specific findings of fact, and, assuming, as we must, "that it made those findings necessary to support its judgment," we cannot say that the damages it awarded were "clearly and palpably erroneous."
 II. Admissibility of the LETS Printout
Edwards contends that the LETS printout, which purported to chronicle numerous traffic-offense convictions attributable to Garrison, was "inadmissible hearsay which does not fall under the public records exception because it was not properly authenticated." Edwards's brief, at 56. However, when the LETS printout, which was plaintiffs' exhibit 1, was offered into evidence, the following colloquy occurred:
 "[Edwards's counsel:] We object to that one, your Honor.
 "[Valentines' counsel:] Well, Judge, he said by letter that he would stipulate it.
 "[Edwards's counsel:] No. The letter says differently. I'm going to object to it as to Robert Edwards. You can ask. . . .
"[Valentines' counsel:] You agreed in a letter. . . .
 "[Edwards's counsel:] . . . Mr. Valentine, anything you want.
 "[Valentines' counsel:] . . . that we could stipulate it into evidence.
 "[The court:] Is there anything in it about Mr. Edwards in here?
 "[Edwards's counsel:] No, sir. It is all about Mr. Garrison.
 "[Valentines' counsel:] It is Mr. Garrison's driving record.
 "[Edwards's counsel:] He can question Mr. Garrison about it without any objection from me.
 "[The court:] All right. It is admitted for that purpose."
(Emphasis added.)
Nevertheless, the Valentines' counsel did not question eitherGarrison or Edwards regarding the LETS printout during the Valentines' case-in-chief. Instead, after the Valentines rested their case, Edwards's counsel offered into evidence defendant's exhibit 29, which was a typed summary of the driving offensesevidenced by the LETS printout. During Edwards's direct examination of Garrison, Edwards's counsel stated: "Well, let me show you what we are going to mark as defendant's exhibit [29] for just a minute. I went through and summarized all the different dates and offenses that you've got here, and I just want to make sure that this is accurate. . . ." After Edwards'scounsel questioned Garrison in detail about the offenses on the summary — including the DUIs and the convictions for driving while his license was revoked or suspended — the summary was admitted into evidence. *Page 327 
The parties still dispute whether Edwards had agreed in pretrial correspondence to stipulate to the admissibility of the LETS printout. However, assuming, without deciding, (1) that there was no such stipulation, (2) that the LETS printout was inadmissible hearsay, and (3) that Edwards's purported objection was effective, notwithstanding his express permission for the Valentines to question Garrison regarding its contents, the error in admitting the LETS printout was harmless. This is so, because Edwards, himself, introduced the relevant substance of the LETS printout through the admission of his typed summary of the offenses and through his direct questioning of Garrison.
It is well settled that evidence "apparently illegal upon admission may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred." Yelton v. State, 294 Ala. 340, 342,317 So.2d 331, 333 (1974); East Alabama Express Co. v. Dupes,271 Ala. 504, 506, 124 So.2d 809, 810 (1960). See also Featherston v.State, 849 So.2d 217, 222 (Ala. 2002); Yeomans v. State,641 So.2d 1269, 1272 (Ala.Crim.App. 1993). Thus, Edwards cannot complain about the admission of the LETS printout where he later offered essentially the same evidence in his own case-in-chief.
 III. Expert Testimony
Finally, Edwards challenges the trial testimony of Dr. Walker, contending that the "trial court abused its discretion in allowing Dr. Walker to give opinions as [a vocational] expert, [because he] was not disclosed by the Valentines in their responses to Mr. Edwards' discovery requests as to expert witnesses." Edwards's brief, at 51. As we noted in Part I.E. of this opinion, Dr. Walker testified that, based on Valentine's education and physical condition, there was "really" nothing Valentine could "try to do in the way of employment." Edwards insists that "[w]ithout this testimony, there is absolutely no evidence to support any award based on Mr. Valentine's loss of earning capacity." Edwards's brief, at 56.
To be sure,
 "[a] party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion."
Ala. R. Civ. P. 26(b)(4)(A)(i). In other words, Rule 26 contemplates pretrial disclosure of (1) the identity of an expert witness, (2) the "subject matter" of his testimony, (3) the "substance of the facts and opinions," and (4) a "summary of the grounds" for his opinion. Moreover, "[a] party is under a [continuing] duty seasonably to supplement [an interrogatory] response with respect to . . . the identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert witness is expected to testify and the substance of the witness's testimony." Rule 26(e)(1) (emphasis added). "[U]nder Rule 26(b)(4)(A), a party's attorney has the right, generally, to rely on an adverse party's answers to interrogatories, to determine the identity of any expert witness expected to be called to testify at trial. . . ." Coastal LumberCo. v. Johnson, 669 So.2d 803, 811 (Ala. 1995).
In his first set of interrogatories to the Valentines, Edwards requested the "name . . . and qualifications of each and every person [the Valentines] expect[ed] to call as an expert witness at trial." Dr. Walker's name first appeared on the Valentines' *Page 328 
answers to Edwards's second set of interrogatories, and only as one who had "assisted," "helped," or "consulted" in relation to Valentine's application for "[S]ocial [S]ecurity or other disability benefits."
However, Dr. Walker examined Valentine, and, on February 20, 2004, submitted the following report:
 "Mr. John Valentine is a 39-year-old white married male who resides in Haleyville, Alabama. I evaluated him on February 6, 2004, in Russellville, Alabama. I administered the Hamilton Depression Inventory [`the HDI'] and a clinical interview, as well as reviewing medical records regarding his injuries suffered in the automobile accident that occurred on May 31, 2002. I also talked with his wife, Tina Valentine, regarding his behavior and activities.
"Background Information
 "Mr. Valentine began his work career at age 16 as a migrant worker. He later worked in a lumberyard for most of 16 years. He then worked in the mobile home industry for 3 years, primarily loading furniture and bedding onto trucks by hand. Except for missing one or two weeks in 1999 with a back strain, he has always worked at regular duty until the automobile accident in 2002.
"Medical Information
 "Mr. Valentine was injured in a wreck on May 31, 2002, and reported pain in the cervical and lumbar areas at his first medical examination and since that time. He continued to work in pain, under Light Duty conditions, until May 15, 2003. At that time, he was restricted to Sedentary work by the orthopedic specialist and has not been able to return to work since then. He has headaches every day and back and neck pain every day. Pain radiates from his low back down his leg. His face will `lock up' at times, with one side of his mouth contorted upward. Although he has consistently reported both lumbar and cervical pain, only the lumbar area was treated by his physicians, so he tried a chiropractor for his neck but with little benefit.
"Psychological Information
 "In the interview, Mr. Valentine admitted to having a lot of anger, depression, and irritability since his injuries. This is attributable to his daily pain and headaches, along with not being able to earn a living any more. He stated he cannot even play with his five-year-old daughter like he used to do and she does not understand. He was prescribed anti-depressant medication, but could not tolerate the side effects.
 "Mr. Valentine's scores on the HDI were valid and consistent with his interview data. He scored well up into the 99th percentile on both the Depression and Melancholia scales. The Melancholia score indicates how much the depression has affected the person's long-term outlook, i.e., hopelessness, discouragement about the future, etc.
"Conclusions
 "Mr. Valentine's orthopedic specialist has restricted him to Sedentary work and he has no skills for that type of employment at all. He has such a high level of depression that he will not be able to concentrate to perform clerical-type duties or to retrain for other work. Although he is relatively young, I do not know any employment that Mr. Valentine can perform in his present condition. Since the accident was almost two years ago, prospects for substantial improvement now are not good. I advised Mr. Valentine to contact his physician and try another anti-depressant medication to try and improve his quality of *Page 329 
life at home. I do not know of anything else to offer him."
(Emphasis added.)
Five days later, that is, on February 25, 2004 — seven months before the first date set for trial[4] — Edwards's counsel received a copy of Dr. Walker's report. At the beginning of the trial, the following colloquy occurred:
 "[Edwards's counsel:] Your Honor, on the issue of Dr. Walker's testimony, Dr. Walker has never been identified as an expert in this case. Interrogatory 2 that was served on the [Valentines] at the very beginning of this case asked them to identify any experts, to state the opinions of the experts and the grounds and bases for their opinions. We have a report from Dr. Walker that was done, I guess, in his capacity as a treating doctor in the sense that he was trying to help Mr. Valentine to get some Social Security disability benefits, but they've never identified him as an expert, and they've never provided us with an expert report with expert opinions or anything of that matter.
 "[The court:] You are saying you are being blind-sided today by him being here?
 "[Edwards's counsel:] Well, I don't mind him coming in and testifying as a lay witness, but he's never been identified as an expert witness to come in and render opinions, you know, beyond that of being factually what he observed of Mr. Valentine.
 "[The court:] That puts me in a situation of either saying, `Okay. We're either going to hold the case today, or we are going to postpone the case until a further date.' I mean, I'm not going to prevent him from testifying if that's — if he is, in fact, your expert.
"[Valentines' counsel:] Judge, can I comment on that?
 "[The court:] I'll ask you — why in the heck didn't you answer and respond in the interrogatories that he was your expert?
 "[Valentines' counsel:] We didn't have him at the time we answered the interrogatories. . . .
 "[The court:] You've got a continuing duty to supplement those.
 "[Valentines' counsel:] That's right. We told him about him and sent him his report. He's known about him. He could have taken his deposition at any time. He's known about him since February of this year.
 "[Edwards's counsel:] I know about him being someone he has gone to and seen for help in getting Social Security disability benefits. I don't mind him testifying about that. But what I don't want him to do is come in and render expert opinions.
 "[The court:] Okay. You can post your objections when he comes to testify."
(Emphasis added.)
Edwards's counsel renewed his objection when Dr. Walker was called to testify. To that objection, the Valentines' counsel responded:
 "First of all, [Edwards's counsel] knew [Dr. Walker] was an expert all along, and at the time we were answering the interrogatories, we probably didn't know about him. I listed him. He has had a report. He had his professional report on the rehabilitation. He could have deposed him. He knew he was an expert. I can't imagine what *Page 330 
he thought he would be testifying about if he was not testifying as an expert. We listed him as a witness after the initial interrogatories. He asked for a list of our witnesses, and we listed him. And he has known Dr. Walker, I think, since he did this [report] in February 2004, maybe before that."
Edwards's objection was overruled, and Dr. Walker proceeded to testify.
During his testimony, the Valentines' counsel asked Dr. Walker: "Okay. And I notice, at the end of your [report], on the secondpage, it's got conclusions. . . . [W]hat conclusions did youarrive at as to his future employability?" (Emphasis added.) Before Dr. Walker answered, the trial court gave Edwards's counsel a continuing objection. The following colloquy then occurred:
 "[Dr. Walker:] Okay. Well, like I say, with looking at the medical opinions about his restrictions on activities and the fact that his weight limit was down to less than 10 pounds, and he had several new items checked on — this is just off the doctor's report. They had increased his restrictions, and I didn't see where he had been treated for depression earlier, so this is apparently getting worse, as well as his physical condition getting worse. By the fact of his restrictions, I didn't know of anything — and I used to work placing people in jobs — I didn't know of anything really to recommend for him to try to do in the way of employment.
"[Valentines' counsel:] Okay.
 "[The court:] The opinion you just expressed was part of the report that has been referred to?
"[Dr. Walker:] Yes.
 "[The court:] And that report was given to the defense counsel when?
"[Edwards's counsel:] February 25, 2004."
(Emphasis added.)
Edwards's counsel objected to admission of the report "only to the extent to which it purport[ed] to express expert opinions." However, he stated: "I pretty much knew what Dr. Walker was going to say by looking at . . . this report from a factual standpoint." The report was admitted into evidence.
On appeal, Edwards does not argue that the trial court erred in admitting the report, which contained Dr. Walker's conclusions. His contention is only that "he was blind-sided with this expert testimony at trial" and "did not have the opportunity to retain his own vocational expert to rebut Dr. Walker's testimony." Edwards's reply brief, at 28 (emphasis added).
"[W]e have consistently recognized that the admission of testimony from witnesses whose identity may not have been disclosed in accordance with properly conducted pretrial discovery procedure is within the trial court's sounddiscretion." Coastal Lumber Co., 669 So.2d at 811 (emphasis added). "Absent palpable abuse of that discretion, the trial court's decision will not be disturbed on appeal." Id. See alsoCrane v. Rush, 577 So.2d 851 (Ala. 1991); Erwin v. Sanders,294 Ala. 649, 320 So.2d 662 (1975).
The only portion of Dr. Walker's testimony to which Edwards objects is that portion opining on Valentine's loss of earning capacity. However, that portion of his testimony differed in no relevant respect from the opinions expressed in the conclusionssection of Dr. Walker's report. It is undisputed that Edwards's counsel received the report several months before trial and that he knew what "Dr. Walker was going to say." In other words, he knew (1) the identity of the witness, (2) the *Page 331 
"subject matter" of his testimony, and (3) the "substance of the facts and opinions," as contemplated by Rule 26. Moreover, the bases, that is, the "the grounds" for Dr. Walker's opinions, were clearly set forth in the report. Thus, through the report, Edwards's counsel was in de facto possession of all the information required by Rule 26(b)(4)(A)(i), Ala. R. Civ. P. Under these circumstances, we cannot conclude that the trial court exceeded its discretion in allowing Dr. Walker to testify.
 IV. Conclusion
For the foregoing reasons, the trial court did not err in overruling Edwards's postjudgment motion to alter, amend, or vacate the judgment. Therefore, the judgment of the trial court is affirmed.
AFFIRMED.
NABERS, C.J., and LYONS, SMITH, and PARKER, JJ., concur.
[1] The complaint also contained claims against Garrison. However, a default judgment was eventually entered against him, and this appeal involves no issues regarding claims against Garrison.
[2] LETS is a "secure, Web-based search engine [developed by computer scientists at the University of Alabama] that allows law enforcement and criminal justice agencies to search numerous databases simultaneously, returning information in real time while it facilitates in-depth searches."
On the date this opinion was released this definition could be found at: http://www.research.ua.edu/archive2003/lets.html (as visited October 14, 2005, and available in the clerk of the Supreme Court's case file).
[3] Valentine's employer refused to allow him to return to work without a "release."
[4] Trial was originally scheduled for September 10, 2004, but was rescheduled for October 1, 2004.