SHAW, Justice.
 

 Anthony Radetic appeals from a judgment in favor of Michael (Mike) Murphy, Sr., Brenda Murphy, and The Eufaula Agency, Inc.
 
 [1]
 
 For the reasons discussed below, we reverse and remand.
 

 Facts and Procedural History
 

 Pursuant to a divorce judgment, Mike Murphy and Brenda Murphy
 
 [2]
 
 were ordered to sell their marital home in Eufaula and to divide the proceeds. The Murphys hired the' Eufaula Agency, a real-estate agency, to assist with the court-ordered sale. Initially, the Murphys entered into a $600,000 contingency-sales contract with individuals who are not parties to the present action.
 
 [3]
 
 However, based upon Radetic’s offer to purchase the house at the same price, purportedly without contingencies, and upon Radetic’s receiving from Quicken Loans (“Quicken”) a “Home Loan Pre-Qualification Certificate” evidencing Radetic’s prequalification for a $540,000 mortgage,
 
 [4]
 
 the Murphys canceled the initial contingency-sales contract and, on April 11, 2006,
 
 [5]
 
 entered into a real-estate-sales contract with Radetic. On that same date, pursuant to the terms of the contract, Radetic remitted to the Eufaula Agency $20,000 in earnest money, which was to be held in escrow by the Eufaula Agency pending closing.
 

 According to the terms of the sales contract between Radetic and the Murphys, closing was scheduled to occur within 30 days. In order to obtain financing, in addition to his previous application to Quicken, Radetic also applied for a loan with Countrywide Home Loans (“Countrywide”). On April 18, 2006, Countrywide informed the Eufaula Agency that Radetic had failed to qualify for the loan. On the following day, Quicken likewise informed Radetic that it was denying his mortgage request. As a result of the foregoing denials, Radetic immediately contacted the Eu-faula Agency to cancel the contract and to request the return of his earnest money.
 

 On May 11, 2006, as permitted by the terms of the real-estate-sales contract, the
 
 *645
 
 Eufaula Agency filed a complaint seeking to interplead the $20,000 earnest money, which, according to the Eufaula Agency, had been claimed both by the Murphys and by Radetic. The parties thereafter engaged in various counter- and cross-pleadings.
 
 [6]
 
 Notably, with regard to the present appeal, the Murphys filed a cross-claim against Radetic seeking damages resulting from the alleged breach of the sales contract by Radetic and Radetic filed a cross-claim against the Murphys asserting fraud and misrepresentation claims based on the Murphys’ alleged failure to disclose defects in the house.
 

 In February 2007, the Murphys’ residence was purchased by another party for $425,000.
 
 [7]
 
 On March 1, 2007, the Eufaula Agency amended its initial interpleader complaint to add a claim asserting that, if the trial court determined that Radetic breached his contract with the Murphys, then the Eufaula Agency was “entitled to ... the amount of commission it would have made on the sale of the home less the commission earned on the sale of the home in February 2007, to a third party for the sum of $425,000.” Similarly, both Mike Murphy and Brenda Murphy amended their cross-complaints to assert a claim that, assuming the trial court determined that Radetic breached the sales contract, they were “entitled to an award of $175,000.00, which is the amount of the loss in property sale, plus additional award of $30,000 in expenses paid as a result from the February 2007 sale to a third party for the sum of $425,000.00.”
 

 On July 26, 2007, Mike Murphy filed a motion seeking a summary judgment as to Radetic’s cross-claim against the Murphys in which Radetic asserted fraud and misrepresentation claims based on allegations that the Murphys had failed to disclose information regarding purported defects in the residence. On September 20, 2007, the trial court entered an order holding that the Eufaula Agency had discharged all responsibility with regard to the inter-pleaded funds and dismissing the Eufaula Agency as a party to the initial interpleader action. In that same order, the trial court granted the summary-judgment motion filed by Mike Murphy, indicating that only the following remaining issues would proceed to a nonjury trial: “[T]he competing claims to the escrow fund, the claims against Radetic for breach of contract and the claim of The Eufaula Agency for loss of commissions.”
 

 Subsequently, Mike Murphy moved for sanctions against Radetic pursuant to Rule 37, Ala. R. Civ. P., asserting that, based on Radetic’s failure to comply with outstanding discovery requests, Murphy was entitled to have “establish[ed] as facts the allegations of breach of contract” asserted against Radetic and to be awarded a default judgment against Radetic. On July 28, 2008, following a hearing, the trial court entered an order granting Mike Murphy’s motion, in which it noted that it was “established as fact ... that ... Ra-detic had the financial ability to close on the residential sales contract made the basis of this action, and further that he breached said contract by failing to close on same.” As a result, the trial court “ordered ... that ... Michael Murphy and Brenda Murphy, and the Eufaula
 
 *646
 
 Agency, have and recover against ... Ra-detic, a judgment by default in the amount [sic] as to all remaining claims in this action.”
 
 [8]
 
 In its order, the trial court scheduled a hearing on damages for September 10, 2008.
 

 Thereafter, in August 2008 Radetic filed a motion seeking to set aside the default judgment, in which he contended that Mike Murphy had failed to meet the requirements entitling him to sanctions under Rule 37. Nothing in the record before us suggests that the trial court ever ruled on Radetic’s motion to set aside the default judgment.
 

 In March 2009, in accordance with a request by the Eufaula Agency and with the purported agreement of the Murphys, the trial court entered an order distributing the majority of the interpleaded funds to the prevailing parties and rescheduling the damages hearing. On February 17, 2010, following that rescheduled hearing, the trial court entered an order containing the following findings:
 

 “By virtue of the Court’s previous default judgment against Radetic, which was effective as to all claims, liability is no longer an issue. The sole issue before the Court is the amount of damages to be assessed against Radetic and in favor of the Murphy Defendants and Eufaula Agency.
 

 “At the hearing, the Court heard testimony from Michael Murphy, Brenda Murphy, and Robert Powers, a real estate broker with Eufaula Agency, Inc. The evidence shows that the Real Estate Purchase Agreement between Anthony Radetic and Brenda and Michael Murphy was in the amount $600,000.00, and Radetic failed to close on the home. Mr. Powers testified that following the breach of the agreement by Mr. Radetic, the Murphys’ continued efforts to market and sell the home for approximately one year. Mr. Powers testified that during that time the local real estate market declined, and they received no offers on the home. On or about January 17, 2007, almost a year after Radetic failed to close on the home, the Murphy Defendants finally received an offer and entered into a contract ... to sell the home at a price of $425,000.00. The parties closed on the sale of this home on February 2, 2007. Therefore, the Murphy Defendants were damaged in the amount of $175,000 by virtue of Ra-detic’s breach. Eufaula Agency was paid a commission of $20,500.00. The evidence showed that had Radetic closed on the home, Eufaula Agency would have earned a commission of $36,000.
 

 “Thus, the evidence presented indicates that because of the market conditions, the Murphy Defendants received no other offers on the home subsequent to Radetic’s breach of contract until they entered into the [January 2007] contract ... despite the fact that they [made] continuing efforts to market and sell the home. They made a good faith effort to mitigate their damages.
 

 “The sales contract between the Murphy Defendants and Radetic was admitted into evidence. Paragraph 16 provides, in pertinent part, as follows:
 

 “ ‘If Buyer/s default by wrongfully refusing to purchase, or by breaching this agreement, and the property does not close, Buyer/s agree (i) to pay said full brokerage fee due broker/s had sale been consummated and (ii) Seller/s may pursue all remedies available to Seller at law and equity including but not limited to Specific Perform-
 
 *647
 
 anee
 
 and
 
 may elect that the earnest money be forfeited by Buyer/s as liquidated damages which shall be divided equally between (1) Seller/s and (2) listing broker (the sum to listing broker not to exceed the full commission) .... In the event of a default by either Seller/s or Buyer/s, all reasonable attorney fees and court costs may be recovered against the defaulting party.’ (Emphasis added.)
 

 “The contract provides that the Murphy Defendants may claim damages on the loss of the sale — that is, the difference in what Radetic should have paid them and what they ultimately sold the home for — plus half of the earnest money. The non-breaching parties are also entitled to attorneys fees. The Court has previously awarded and distributed to the Murphy Defendants part of their share of the earnest money, net of attor-' ney fees, in the total amount of $7,250. Thus, the Murphy Defendants are entitled to a judgment in the amount of (1) $175,000, which is the difference in the price Radetic had agreed to pay for the home and the amount that [a subsequent purchaser] ultimately paid, plus (2) $2,750 (the balance of the earnest money, previously interpled and distributed to pay one-half of the interpleader attorneys’ fees, such that their total liquidated damages award is $10,000), for a total judgment of $177,750.”
 

 The trial court further awarded the Eufau-la Agency a judgment for its lost commission on the Radetic sales contract less the amount of the earnest money previously distributed to the Eufaula Agency.
 

 On March 11, 2010, Radetic timely moved to alter, amend, or vacate the trial court’s damages award or, in the alternative, for a new trial, in which he argued that the Murphys and the Eufaula Agency had failed to present any evidence reflecting the fair market value of the residence at the time he breached the real-estate-sales contract, which, he argued, was the correct date for measuring damages under Alabama law. Radetic filed a timely notice of appeal to this Court on July 20, 2010.
 
 [9]
 

 Standard of Review
 

 “Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies. Our ore tenus standard of review is well settled. ‘ “When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.” ’
 
 Smith v. Muchia,
 
 854 So.2d 85, 92 (Ala.2003) (quoting
 
 Allstate Ins. Co. v. Skelton,
 
 675 So.2d 377, 379 (Ala.1996)).
 

 “ ‘ “The
 
 ore tenus
 
 rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.”
 
 Hall v. Mazzone,
 
 486 So.2d 408, 410 (Ala.1986). The rule applies to “disputed issues of fact,” whether the dispute is
 
 *648
 
 based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence.
 
 Born v. Clark,
 
 662 So.2d 669, 672 (Ala.1995). The
 
 ore tenus
 
 standard of review, succinctly stated, is as follows:
 

 “ ‘ “[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court’s conclusion on issues of fact, and this Court will not disturb the trial court’s conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.” ’
 

 “Reed v. Board of Trs. for Alabama State Univ.,
 
 778 So.2d 791, 795 (Ala.2000) (quoting
 
 Raidt v. Crane,
 
 342 So.2d 358, 360 (Ala.1977)). However, ‘that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts.’
 
 Ex parte Board of Zoning Adjustment of Mobile,
 
 636 So.2d 415, 417 (Ala.1994).
 

 “ ‘The ore tenus standard of review extends to the trial court’s assessment of damages.’
 
 Edwards v. Valentine,
 
 926 So.2d 315, 325 (Ala.2005). Thus, the trial court’s damages award based on ore tenus evidence will be reversed ‘only if clearly and palpably erroneous.’
 
 Robinson v. Morse,
 
 352 So.2d 1355, 1357 (Ala.1977).”
 

 Kennedy v. Boles Inv., Inc.,
 
 53 So.3d 60, 67-68 (Ala.2010).
 

 Discussion
 

 I.
 

 Initially, we note that the Mur-phys devote their entire brief to this Court to the contention that Radetic’s notice of appeal was untimely. More specifically, they argue that, because it was not subsequently modified, the trial court’s July 28, 2008, order constituted a final judgment and that the denial by operation of law of Radetic’s August 2008 motion seeking relief from that judgment caused the 42-day period for filing an appeal,
 
 see
 
 Rule 4(a)(1), Ala. R.App. P., to expire prior to Radetic’s filing of a notice of appeal on July 20, 2010.
 
 [10]
 
 We disagree.
 

 “ ‘An appeal ordinarily lies only from a final judgment.’
 
 Tomlinson v. Tomlinson,
 
 816 So.2d 57, 58 (Ala.Civ.App.2001). ‘For a judgment to be final, it must be issued by a court of competent jurisdiction and reflect a complete resolution of each and every matter in controversy.’
 
 Potter v. Owens,
 
 535 So.2d 173, 174 (Ala.Civ.App.1988).”
 

 Alvira v. Campbell,
 
 909 So.2d 847, 849 (Ala.Civ.App.2005). Here, the trial court’s July 28, 2008, order, although determining Radetic’s liability, clearly did not dispose of the issue of the accompanying damages award. Therefore, it was not a final, ap-pealable order.
 

 “It is well established that a final judgment is a ‘terminal decision which demonstrates there has been a
 
 complete adjudication
 
 of all matters in controversy between the litigants.’
 
 Tidwell v. Tidwell,
 
 496 So.2d 91, 92 (Ala.Civ.App.1986). Further, the judgment must be conclusive and certain with all matters decided,
 
 including the assessment of damages with specificity for a sum certain
 
 determinable without resorting to extraneous facts,
 
 Jewell v. Jackson & Whitsitt Cotton Co.,
 
 331 So.2d 623 (Ala.1976).”
 

 Dees v. State,
 
 563 So.2d 1059, 1061 (Ala.Civ.App.1990) (emphasis added). In
 
 Dees,
 
 the Court of Civil Appeals concluded, based on a finding that there had been
 
 *649
 
 both a determination of liability
 
 and
 
 a stipulation as to the amount of damages, that “the judicial labor ended and nothing unfinished or inconclusive remained.”
 
 Id.
 
 In the present case, however, there remained “judicial labor” to perform, namely, the assessment of damages based on the trial court’s previous liability determination. Therefore, contrary to the Mur-phys’ argument, the February 17, 2010, order did not simply acknowledge the July 2008 judgment but constituted a final, ap-pealable order because it conclusively determined all remaining issues in the case. See
 
 Jetton v. Jetton,
 
 502 So.2d 756, 758 (Ala.1987) (“It is a well established rule that, with limited exceptions, an appeal will lie only from a final judgment which determines the issues before the court and ascertains and declares the rights of the parties involved.” (citations omitted));
 
 Jewell v. Jackson & Whitsitt Cotton Co.,
 
 831 So.2d 628, 625 (Ala.1976) (“A final judgment is a terminative decision by a court of competent jurisdiction which demonstrates there has been complete adjudication of all matters in controversy between the litigants within the cognizance of that court. That is, it must be conclusive and certain in itself.” (citations omitted)).
 

 As discussed in note 9,
 
 supra,
 
 Radetic’s postjudgment motion challenging the February 2010 order was denied by operation of law on June 9, 2010 — 90 days following its filing date of March 11, 2010. That postjudgment motion, which was filed within 30 days of the trial court’s entry of its damages order, was filed pursuant to Rule 59, Ala. R. Civ. P., and, thus, while pending, tolled the time for filing a notice of appeal.
 
 See
 
 Rule 4(a)(3), Ala. RApp. P. (“If such post-judgment motion is deemed denied under the provisions of Rule 59.1 of the Alabama Rules of Civil Procedure, then the time for filing a notice of appeal shall be computed from the date of denial of such motion by operation of law, as provided for in Rule 59.1.”). Radetic filed his notice of appeal to this Court on July 20, 2010, the 41st day following the denial of his postjudgment motion; his appeal was thus timely.
 
 See
 
 Rule 4(a)(1), Ala. RApp. P.
 

 II.
 

 We now address the substantive issue raised by Radetic on appeal. Although conceding liability, Radetic argues that the trial court incorrectly calculated the damages due the Murphys on their breach-of-contract claim. He specifically contends that, in calculating that damages award, the trial court erroneously considered the fair market value of the Murphy residence
 
 at the time of its
 
 sale for $475,000
 
 in February 2007,
 
 rather than the
 
 fair market value in April 2006,
 
 when the breach actually occurred. We agree.
 

 It is well settled that “[t]he measure of damages for the breach of a contract for the sale of land is the difference between the contract price and the market value at the time of the breach.”
 
 Wilkens v. Kaufman,
 
 615 So.2d 613, 614 (Ala.Civ.App.1992).
 
 See also Duncan v. Rossuck,
 
 621 So.2d 1313, 1315-16 (Ala.1993) (“The measure of damages for the breach of a contract involving the sale of land is the difference between the contract price and the market value of the land on the date of the breach.”);
 
 Brett v. Wall,
 
 530 So.2d 797, 798 (Ala.1988) (“Of course, the measure of damages for the breach of a contract for the sale of land is the difference between the contract price and the market value at the date of the breach.”);
 
 Woodham v. Singletary,
 
 545 So.2d 78, 78 (Ala.Civ.App.1989) (“The measure of damages for the breach of a contract involving the sale of land is the difference between the contract price and the market value at the date of the breach.”); and
 
 Cook v. Brown,
 
 428 So.2d 59, 62 (Ala.Civ.App.1982) (“We
 
 *650
 
 readily agree that the measure of damages for the breach of a land sale contract is the difference between the contract price and the market value at the date of the breach.”).
 

 Here, the sales contract between the Murphys and Radetic provides that the proposed sale was due to close within 30 days of April 8, 2006; therefore, the last possible closing date available to Radetic was May 8, 2006. Consequently, as evidenced by the Murphys’ prelitigation demand for the earnest money held by the Eufaula Agency, the breach at issue occurred in early 2006. In determining the value of the residence, however, the trial court admittedly used the sales price from a closing that occurred over eight months later. The trial court’s February 2010 order clearly indicates that, in calculating the Murphys’ damages, it relied on evidence that “[o]n or about January 17, 2007, almost a year after Radetic failed to close on the home, the Murphy Defendants finally received an offer and entered into a contract ... to sell the home at a price of $425,000.00.” Based on that evidence, the trial court then computed the Murphys’ damages by awarding “the difference in what Radetic should have paid them and what they ultimately sold the home for....”
 

 As noted above, the trial court relied on the following language from the sales contract as support for its method of calculating the damages:
 

 “ ‘If Buyer/s default by wrongfully refusing to purchase, or by breaching this agreement, and the property does not close, Buyer/s agree (i) to pay said full brokerage fee due broker/s had sale been consummated and (ii) Seller/s may pursue all remedies available to Seller/s at law and equity including but not limited to Specific Performance
 
 and
 
 may elect that the earnest money be forfeited by Buyer/s as liquidated damages which shall be divided equally between (1) Seller/s and (2) listing broker (the sum to listing broker not to exceed the full commission) .... In the event of a default by either Seller/s or Buyer/s, all reasonable attorney fees and court costs may be recovered against the defaulting party.’ (Emphasis added [by trial court].)”
 

 The trial court interpreted the foregoing provision to mean “that the Murphy Defendants may claim damages on the loss of the sale — that is, the difference in what Radetic should have paid them and what they ultimately sold the home for — plus half of the earnest money.” We disagree. In fact, we see nothing in the record before us to support the trial court’s deviation from our well established damages formula applicable to a breach of a contract involving the sale of land, and the Murphys have failed to present any authority justifying that deviation. Because the trial court improperly applied the law to the facts, the ore tenus rule does not apply.
 
 See Kennedy, supra.
 

 As a final matter, we note that in its order purporting to deny Radetic’s post-judgment motion challenging the February 2010 order, the trial court stated that “Ra-detic offered
 
 no
 
 evidence of the fair market value of the home in response to ... [the Murphys’] damages claims.” Contrary to that assertion, however, the transcript of the damages hearing reflects that Radetic did elicit testimony both from the Murphys and from a representative of the Eufaula Agency as to the value of the residence in or around April 2006. Specifically, when questioned about the value of the residence at the time they entered into the sales contract with Radetic, although unable to assign an exact figure, Brenda Murphy testified that they had obtained an appraisal that was “well over six [hundred thousand].” She further indicated that, at the time Radetic first expressed interest in the residence, the property was listed for
 
 *651
 
 either $625,000 or $650,000, which amount, she said, represented “what [she] wanted for the house.”
 
 See, e.g., Wilkens,
 
 615 So.2d at 615 (“A person may testify to the value of his or her land, even if that person is not an expert.”).
 

 Additionally, the broker employed by the Eufaula Agency, who performed the market analysis on the Murphy residence at the time it was listed for sale, confirmed that the asking price for the residence, which was based upon a competitive market analysis and an appraisal, was $625,000. The broker later admitted, however, that the $600,000 price both the previous potential purchasers and Radetic had been willing to pay for the residence was the fair market value of the property in that it represented what the sellers were willing to accept and potential buyers were willing to pay at that time. Mike Murphy, too, represented to the trial court that, although he had invested in excess of $700,000 in the residence, it was, in his opinion, worth only what a buyer such as Radetic was willing to pay. Therefore, there was evidence of the value of the residence at the time of the breach, which would have permitted the trial court to assess damages pursuant to the above-stated rule of law; however, it is clear that the trial court did not consider that evidence in computing its award of damages.
 

 Because the trial court erred in basing its damages award “on evidence of the residence’s value after the breach,” we reverse the trial court’s damages award and remand this case for further proceedings consistent with this opinion.
 
 Woodham, swpra. See also Brett,
 
 530 So.2d at 799 (holding that “the trial court erred in concluding that, because the testimony established ‘that the lot has a value, a fair market value,
 
 today
 
 of $90- to $95,000, it would appear the difference in value as of the time of this contract
 
 and the time of this judgment
 
 would be the sum of $15,-000.00’ ”).
 

 REVERSED AND REMANDED.
 

 COBB, C.J., and STUART, PARKER, and WISE, JJ., concur.
 

 [1]
 

 . Although the Eufaula Agency is listed as an appellee on the notice of appeal and on the briefs submitted to this Court, it does not appear that Radetic challenged the damages award as to it.
 

 [2]
 

 . At various locations in the record, Brenda Murphy is also referred to as "Brenda J. Shiver.”
 

 [3]
 

 . As reported by all parties, the initial sales contract was made contingent upon the sale of the prospective purchasers' residence in Florida.
 

 [4]
 

 . The prequalification certificate prepared for Radetic by Quicken was based on Radetic’s "quick application” for a loan via telephone. On its face, the document stated both that "[p]re-qualification was contingent upon [Quicken's] receipt of” further documentation and that it was not a "final commitment,” but was "contingent upon final underwriting review.”
 

 [5]
 

 . Although the written agreement is dated April 8, 2006, a subsequent notation on page 4 of the document evidences the "date of acceptance by all parties” as April 11, 2006.
 

 [6]
 

 . The fraud claim filed by Brenda Murphy was dismissed by the trial court.
 

 [7]
 

 . According to the testimony of Brenda Murphy, the residence remained on the market following Radetic's alleged breach of the April 2006 contract; however, she indicated that, during the interim, they received only offers which were "far under" the $600,000 sales price they had previously negotiated with Ra-detic. Pursuant to the terms of the Murphys' divorce judgment, $425,000 represented "[t]he minimum bid to be accepted for [the] property.”
 

 [8]
 

 . It is unclear from the record when or if Brenda Murphy and the Eufaula Agency joined Mike Murphy's motion for a default judgment; notwithstanding that uncertainty, the trial court entered a default judgment against Radetic in favor of all three.
 

 [9]
 

 . On July 26, 2010, the trial court entered an order purporting to deny Radetic’s post-judgment motion; however, pursuant to Rule 59.1, Ala. R. Civ. P., that motion was actually denied by operation of law on June 9, 2010.
 
 See Smith v. Smith,
 
 4 So.3d 1178, 1181 (Ala. Civ.App.2008) ("Rule 59.1, Ala. R. Civ. P„ provides that a postjudgment motion that remains pending for 90 days is deemed denied by operation of law, and the trial court loses jurisdiction to rule on that motion.”). Rule 59.1 provides, in pertinent part, that "[n]o postjudgment motion filed pursuant to Rules 50, 52, 55, or 59 shall remain pending in the trial court for more than ninety (90) days, unless with the express consent of all the parties,” and that the trial court’s failure to dispose of such a pending postjudgment motion "shall constitute a denial of such motion as of the date of the expiration of the period.”
 

 [10]
 

 . The fact that there was a period when this action was stayed as a result of Radetic’s bankruptcy filing has no effect here on our analysis of the timeliness of Radetic's appeal.