THOMPSON, Presiding Judge.
Sheila Smith (“Sheila”) appeals from a judgment of the Clay Circuit Court ordering the sale of a certain parcel of land and the division of the proceeds therefrom. For the reasons set forth herein, we reverse the trial court’s judgment and remand the cause to the trial court for the entry of a new judgment.
Sheila’s maternal grandfather was M.D. Amason (“Amason”). Amason’s children included Sheila’s mother Maxine Caldwell (“Maxine”), Sybil Martin (“Sybil”), Mary Prue Walker (“Mary”), Manard D. Amason (“Manard”), Robert H. Amason (“Robert”), Carol Canady (“Carol”), Shirley Buckhan-nan (“Shirley”), Deborah Darlene Amason Wise (“Deborah”), and Sue Amason (“Sue”).[1] Sue died as a teenager leaving no children. Sybil died before the time relevant to the present litigation, leaving two sons, Jeffery Martin (“Jeffery”) and Jonathan Martin (“Jonathan”). Sheila was Maxine’s only child.
Amason owned a substantial amount of real property. In his will, he devised separate parcels of land to each of his children except Sue. The parcels Amason devised to Deborah are the subject of the present litigation and are referred to herein as “the disputed property.” The disputed property comprises approximately 175 acres.
The paragraph at the end of the portion of Amason’s will devising his land to his children described the nature of those devises as follows:
“Each and every item and tract of land as described in paragraphs one to nine hereinabove, is willed to each party therein named, for and during their natural life. During their natural life each shall have the right to use, occupation, income, rents, and the right to cut and remove timber therefrom and, at the death of each of my said children, the real estate so willed shall vest in his or her children, if any, share and share alike.”
Thus, Amason devised to each of his children a life estate in his or her parcel and a contingent remainder in fee simple in the child’s children, with Amason’s estate maintaining a reversion in fee simple. See 3 Richard R. Powell, Powell on Real Property § 20.02[3] (June 2002). We note that a reversion is a vested interest that is alienable. See Baugh v. Moon, 289 Ala. 280, 282, 267 So.2d 130, 131 (1972) (“A reversion is a present vested interest or estate and it arises by construction and operation of law whenever a Grantor has conveyed less than his whole interest or estate; the undisposed portion being his when the grant is terminated. This vested interest is subject to be conveyed by the Grantor by deed, to be bequeathed by will, or could be reached by execution and passed to execution purchaser.”). Ama-son’s will provided that his executor was to sell the residuary of his estate and “divide the proceeds therefrom among [his] children living and the heirs of anyone who has deceased, to his or her heirs, under the laws of descent and distribution.” Amason died at some point before the time relevant to the present litigation.
*79 In 1995, Deborah, who did not have children, executed a will in which she devised her entire estate to Sheila, her niece. On the day of a family reunion in 2008, Deborah presented a quitclaim deed (“the first quitclaim deed”) to her siblings that conveyed to Deborah any right, title, interest, or claim (presumably any reversionary interest they might have) in the disputed property. Maxine, Mary, Manard, Robert, Carol, and Shirley executed the deed. Winfred Canady, Carol’s husband, signed the deed as a witness, and Sheila notarized it. Deborah also sent to Jeffery and Jonathan a separate quitclaim deed (“the second quitclaim deed”) that conveyed any right, title, interest, or claim they had (presumably as heirs of their mother, Sybil) in the disputed property to Deborah. Jeffery and Jonathan executed the deed and had it notarized. The deeds were recorded. Later in 2003, Maxine died. Deborah died in 2004.
Sheila instituted the present action against Mary, Manard, Robert, Carol, Shirley, Jeffery, and Jonathan (“the defendants”) on April 2, 2008. She asserted that she owned the disputed property through devise and deed conveyances but that she had received a letter indicating that the defendants disputed her ownership of the disputed property. She sought a judgment declaring that she owned the disputed property in fee simple. She requested that, should the court determine that she did not own the disputed property in fee simple, the court order that the disputed property be sold with the proceeds divided among the owners of the property.
Sheila filed a motion for a summary judgment, which is not included in the record on appeal. In their response to that motion, the defendants argued, among other things, that the quitclaim deeds they had executed were not valid because the deeds were not executed in the presence of a notary and they did not acknowledge their signatures before a notary. The trial court denied Sheila’s summary-judgment motion.
On February 8, 2010, Sheila amended her complaint by asserting that if the quitclaim deeds were not properly acknowledged or witnessed, the deeds, at the very least, constituted enforceable agreements to execute an instrument passing legal title to Deborah and that, as such, they were subject to specific performance. Thus, she requested that, should the court find that the deeds were invalid, the court enter an order requiring the defendants to execute an instrument conveying title to the disputed property to Sheila.
On October 18, 2010, the trial court held a bench trial of the action. At the trial, Sheila testified that Deborah was not married at the time of her death and that she had no children. She testified that only eight years separated Deborah and her in age and that they had had a close relationship.
Sheila testified that Deborah’s siblings had executed the first quitclaim deed on the day of the family reunion in 2003 either at the community center at which the reunion was held or at Maxine’s house. Maxine, she stated, was sick at that time and had been unable to attend the reunion. Sheila, who had notarized the first quitclaim deed, stated that she saw all six of the siblings sign the deed and that they had done so voluntarily.
Sheila testified that some of her mother’s siblings had sold the property they had inherited from Amason and that, in so doing, they had had the other family members execute deeds regarding their respective properties similar to the quitclaim deeds Deborah had had her siblings and nephews execute.
*80 Mary testified that Deborah presented the first quitclaim deed to her at the family reunion. She stated that Deborah had asked her to sign the deed so that she could obtain a new house. Mary testified that she did not know what a quitclaim deed was and that she would not have signed it had she known that Deborah’s will devised the disputed property to Sheila. Mary admitted, however, that she did not read the deed and that no one forced her or pressured her to sign it. She stated that she could have refused to sign it or that she could have had a lawyer review the document before she signed it but that she chose not to do so. She also stated that she did not ask Sheila or Deborah what the quitclaim deed was. She testified that she would not have had a problem with Deborah’s using the quitclaim deed to sell the property. Mary testified that she did not see Sheila at the time she signed the quitclaim deed and that, to her knowledge, Sheila was not present in the room when she signed it.
Carol testified that she signed the first quitclaim deed during the family reunion at Deborah’s request and that Deborah had not told her she had made a will devising the disputed property to Sheila. She testified that she did not know what a quitclaim deed was and that she did not know that Deborah was asking her to give up any interest she might have in the disputed property. However, Carol also testified that she signed the quitclaim deed voluntarily and that no one pressured her or forced her to sign it. She stated that she had the opportunity to read and review the quitclaim deed as long as she wanted and that she did not ask Deborah what she was signing or question Deborah about it. She stated that she believed that, at the time she signed the deed, Maxine and Mary had already signed it.
Carol testified that, after she signed the first quitclaim deed, Deborah asked Carol’s husband, Winfred Canady, who had been sitting with Carol when she signed the deed, to witness the deed. Winfred did so. Carol testified that she did not recall seeing Sheila at the family reunion.
Shirley testified that she signed the first quitclaim deed during the family reunion at Deborah’s request and that Deborah had not told her she had made a will devising the disputed property to Sheila. She stated that Deborah had told her that the purpose of the deed was for Deborah to obtain another house. She stated that she did not read the deed before she signed it, that nothing had prevented her from reading it, that she had signed the deed voluntarily, and that no one had pressured her or forced her to sign it. She stated that she did not ask Deborah what the deed was or ask her to explain it to her. She stated that she would not have minded if Deborah had sold the disputed property and purchased another house, but she said she would not have signed the deed if she had known the property would descend to Sheila.
Shirley testified that no one else was around when she signed the first quitclaim deed. She stated that she could not recall whether she had seen Sheila at the reunion before she signed the deed.
Robert testified that he signed the first quitclaim deed at Maxine’s house after he left the reunion. He stated that, at the time he signed the deed, Deborah said something to him about trying to obtain another house. He stated that he thought he was the only person in the room when he signed the deed and that no one witnessed his signature. He admitted that no one pressured or coerced him to sign the deed and that, although he did not read the deed, he could have done so had he so chosen. He also stated that he could have *81 refused to sign the deed. Robert stated that he did not see Sheila at the family reunion.
Manard testified that Deborah had approached him at Maxine’s house regarding the first quitclaim deed after he left the family reunion. He stated that he knew the deed was a quitclaim deed and that he did not feel like he had any interest in the disputed property at that time. He testified that Deborah did not tell him what she was intending to do with the disputed property and that he did not ask. He stated that no one pressured him to sign the deed and that, although he did not read the deed before he signed it, no one had prevented him from doing so. He also stated that he could have refused to sign the deed. Manard stated that Sheila had not been at the family reunion and was not at Maxine’s house when he was there. He stated that, when he signed the deed, Deborah and he were alone in Maxine’s kitchen.
Jonathan testified that he and Jeffery had received a telephone call from Deborah asking that they sign a quitclaim deed regarding their interests in the disputed property. He stated that, in their telephone conversation, Deborah told them:
“If we would, to get over and sign this and get it back to her; that she — at that time her sister had just passed away and she said she had been thinking about things and said that she was worried in the event of her death that the estate could claim everything she owned. And she didn’t want that to happen; that it should go back to the family; and that that’s what this was all about. So we— There seemed to be an urgency over it.”
Jonathan stated that, several days after the conversation, Jeffery and he received the second quitclaim deed in the mail and they went to a notary public together and signed it. He stated that no one forced him to sign the deed, and he admitted that if Deborah had simply sold the disputed property once he signed the deed, he could not have done anything about it.
Jeffery also testified regarding the conversation Jonathan and he had with Deborah concerning the second quitclaim deed. When asked what Deborah had said, Jeffery stated: “Just that we need to sign— Because our mother was deceased, we needed to sign in her place to keep the estate from getting what she had because she didn’t have any sons or daughters to leave it to.” At one point during his testimony, Jeffery stated that he signed the second quitclaim deed before a notary public; he later testified that he did not remember whether he had done so. Jeffery testified that he knew that Deborah was having the family sign the quitclaim deeds so she could convey the disputed property however she wanted; he stated that he did not have a problem with Sheila’s inheriting what Deborah had left her in her will.
On June 28, 2011, the trial court entered a judgment in which it made the following findings:
“1. The great weight of the evidence presented at trial indicates that the quitclaim deed[s] ... were improperly executed, and in certain instances the grant[or]’s signatures fraudulently procured by the representations of the grant[ee]. Both deeds are due to be set aside and are held to be void instruments.
“2. Because the quitclaim deeds in question have been declared void, the parties to this action are held to be tenants in common of the property described in the deeds in question. The described property cannot be equitably divided or partitioned among the tenants in common without a sale of same. [Sheilaj’s request for a sale for division is due to be granted.”
*82 The trial court ordered that the quitclaim deeds be set aside as void, and it ordered that the disputed property be sold, with the proceeds from the sale divided among the heirs of Amason. Sheila filed a timely appeal to our supreme court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
The standard by which this court reviews a judgment following a bench trial at which ore tenus evidence was received is well settled:
“Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies. Our ore tenus standard of review is well settled. ‘ “When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.” ’ Smith v. Muchia, 854 So.2d 85, 92 (Ala.2003) (quoting Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996)).
“ ‘ “The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.” Hall v. Mazzone, 486 So.2d 408, 410 (Ala. 1986). The rule applies to “disputed issues of fact,” whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So.2d 669, 672 (Ala.1995). The ore tenus standard of review, succinctly stated, is as follows:
“ ‘ “[Wjhere the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court’s conclusion on issues of fact, and this Court will not disturb the trial court’s conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.” ’
“Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala. 2000) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977)). However, ‘that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts.’ Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 417 (Ala.1994).
“ ‘The ore tenus standard of review extends to the trial court’s assessment of damages.’ Edwards v. Valentine, 926 So.2d 315, 325 (Ala.2005). Thus, the trial court’s damages award based on ore tenus evidence will be reversed ‘only if clearly and palpably erroneous.’ Robinson v. Morse, 352 So.2d 1355, 1357 (Ala.1977).”
Kennedy v. Boles Invs., Inc., 53 So.3d 60, 67-68 (Ala.2010).
Sheila contends that the evidence did not support the trial court’s finding of fraud as a basis for setting aside the quitclaim deeds. As to fraud in the conveyance of real property, our supreme court has written:
“When a grantor fails to read a deed (having the ability to read and understand it) and this results in his execution of an instrument which conveys realty, although he subsequently avers he did not intend to convey, the grantor’s mistake will be attributed to his own negligence and the deed will be upheld so long as his signature was not induced by fraud or misrepresentation. Colburn v. Mid-State Homes, Inc., 289 Ala. 255, 266 So.2d 865 (1972).
“Accordingly, if the deed in this case is to be set aside because of appellee’s lack of intention to convey the property *83 described therein, appellee must prove that she acted under the influence of fraud or misrepresentation. This Court has held that ‘The degree of proof required to rescind or cancel a conveyance because of fraudulent misrepresentation is more than a mere probability of the truth of the charge of fraud.’ Hodges v. Beardsley, 269 Ala. 280, 282, 112 So.2d 482, 483-84 (1959).
“In cases where the grantor seeks to set aside a deed on the ground that a fraudulent misrepresentation induced him to sign the deed without knowledge of its contents, this Court has required that the fraud must be clearly and satisfactorily proven. Cross v. Maxwell, 263 Ala. 509, 83 So.2d 211 (1955); Hodges v. Beardsley, supra.
“ ‘If the proof is uncertain in any material respect, it will be. held insufficient, though the court may feel that a great wrong has been done; the court cannot grant the relief by reason of uncertainty.’ Wooddy v. Matthews, 194 Ala. 390, 69 So. 607 (1915).”
Ingram v. Horn, 294 Ala. 353, 355-56, 317 So.2d 485, 486 (1975). Discussing the same principle, our supreme court wrote in Cross v. Maxwell, 263 Ala. 509, 512, 83 So.2d 211, 214 (1955), that
“a false representation, to constitute fraud upon which a cancellation [of a deed] can be based, must be of an existing fact, and not a promise of something to be done in the future, unless it be shown that at the time such promise as to the future was made, it was made with the intention of deceiving, and with no intention of fulfillment at the time.”
Sheila contends that there is no evidence indicating that Deborah made any false or otherwise fraudulent statements to the defendants concerning the quitclaim deeds. We agree.
The trial testimony reflects that Deborah, in explaining why she wanted her siblings to sign the first quitclaim deed, told some of them that she wanted to be able to purchase a house. The testimony also reflects that she told Jonathan and Jeffery that she wanted to keep the disputed property from being conveyed to “the estate.” There is no evidence that either of those statements were untrue or were otherwise fraudulent. Specifically, there is no evidence indicating that Deborah was not attempting to obtain fee ownership of the disputed property so that she could obtain a new house or that she was not attempting to keep the disputed property from being conveyed, at her death, to Amason’s estate.
As stated above, the defendants had the burden of demonstrating fraud on the part of Deborah by clear and convincing evidence in order to have the quitclaim deeds set aside. There is no evidence in the record, let alone clear and convincing evidence, of any such fraud by Deborah, and, as a result, the trial court’s conclusion that some of the defendants’ signatures on the quitclaim deeds were procured by fraud was in error.[2]
Sheila also contends that the trial court’s finding that the quitclaim deeds at issue were improperly executed is not supported by the evidence. She argues that the evidence at trial demonstrated that the defendants signed the deeds, that the deeds were properly notarized, and that the first quitclaim deed, which had been signed by Deborah’s siblings, had been properly witnessed as well.
*84 Section 35-4-20, Ala.Code 1975, provides that any conveyance of real property must be in writing, signed by the grantor, and attested to, in most circumstances, by one witness.[3] An acknowledgment of the conveyance before a notary public meets the requirement that a written conveyance be witnessed. § 35-4-23, Ala.Code 1975. There is no question that all the defendants signed the quitclaim deeds at issue in this case. Thus, the issue presented is whether the acknowledgment or attestation of the quitclaim deeds was proper.
As to the notarization of the quitclaim deeds, we note that “[a] certificate of acknowledgment on an instrument transferring an interest in real property is presumed correct, and the party contending it is invalid must demonstrate the invalidity by clear and convincing evidence.” Farmer v. Hypo Holdings, Inc., 675 So.2d 387, 391 (Ala.1996). The propriety of a notarization was discussed, albeit in reference to mortgages,, in Eason v. Bynon, 781 So.2d 238, 240-41 (Ala.Civ.App.2000):
“If a notary public does not witness the signatures of the mortgagors, is not in the place where the mortgagors sign the mortgage, does not see or speak to the mortgagors when they sign the mortgage, and the mortgagors do not acknowledge to the notary that they executed the mortgage, the mortgage is invalid and the notary’s act of signing his name and affixing his notarial seal to the mortgage is a violation of his legal duty.”
As to the' first quitclaim deed, which Sheila notarized, Sheila testified that she saw all of Deborah’s siblings sign that deed but that she did not speak with them about the deed or their execution of it. All of Deborah’s siblings who testified, however, stated that Sheila was not in their presence when they signed the deed, and several of them testified that they did not recall even seeing Sheila at the reunion or' at Maxine’s house where they signed the deed. The evidence supports a conclusion that Sheila did not, in fact, see them sign the deed. When that testimony is coupled with Sheila’s own testimony that the basis for her notarization of the deed was that she saw Deborah’s siblings sign the deed, the conclusion can be fairly drawn that Sheila’s notarization of the first quitclaim deed Was improper. See Eason, 781 So.2d at 241.
As previously stated, when a trial court hears conflicting oral testimony, a presumption of correctness attaches to its findings of fact. Kennedy, 53 So.3d at 67-68. Here, we cannot say that clear and convincing evidence would not support a finding of fact by the trial court that Sheila’s notarization of the first quitclaim deed was improper as to Mary, Carol, Shirley, Robert, and Manard.[4]
*85 The defendants failed, however, to carry their burden to demonstrate the invalidity of Sheila’s notarization of the deed as to Maxine. Simply put, Sheila testified that she saw Maxine sign the first quitclaim deed, and the defendants presented no evidence to contradict that testimony. As a result, as to Maxine, the deed is not invalid on the basis of an improper acknowledgment. Similarly, the defendants failed to demonstrate that the second quitclaim deed, which Jonathan and Jeffery executed and which was notarized by someone other than Sheila, was invalid because of an improper acknowledgment. On its face, the quitclaim deed they executed purports to have been properly notarized, and no evidence presented at trial demonstrated that that notarization was improper.[5]
In a two-sentence argument in their appellate brief, the defendants argue that Sheila had a financial interest in the conveyance affected by the quitclaim deeds and, as a result, that she was not qualified to serve as a notary as to the first quitclaim deed. We disagree. In Frazier v. Malone, 387 So.2d 145 (Ala.1980), our supreme court stated that an acknowledgment by an individual with a financial interest in a conveyance, rather than just the transaction, is disallowed, except where the interest is no more than secondary or incidental. In the present case, Sheila was not a party to the quitclaim deeds and her interest in the conveyance of the disputed property to Deborah was merely secondary to Deborah’s interest in the conveyance and was subject to complete divestment should Deborah decide to change her will. Under these circumstances, we cannot conclude that Sheila’s acknowledgment of the first quitclaim deed was invalid as to Maxine on the basis of any interest she may have had in the transaction. See also In re Estate of Hogg, 147 Vt. 101, 103, 510 A.2d 1323, 1324 (1986), rev’d on other grounds, Staruski v. Continental Telephone Co. of Vermont, 154 Vt. 568, 581 A.2d 266 (1990) (holding that attorney who was presumptive heir of his mother’s estate was not disqualified from acknowledging the signatures of his mother and her new husband relative to their antenup-tial agreement because he did not have a direct, pecuniary interest in that agreement).
Sheila points out that, in addition to being notarized, the first quitclaim deed was witnessed by Winfred Canady, Carol’s husband, and, as a result, that that quitclaim deed was validly executed despite any impropriety as to her acknowledgment of the deed. As to Carol and Mary, we agree. Carol testified that Winfred was sitting next to her when she executed the deed and that he signed the deed as a witness immediately following her execution of the deed. Although Mary stated that Sheila was not with her when she executed the deed, she did not testify, nor is there any other evidence indicating, that Winfred did not see her sign the deed. “One seeking to have a deed declared invalid must show by clear and convincing evidence the facts relied upon to demonstrate the invalidity; and that party seeking to have the deed set aside bears the burden of proof.” Thompson v. Mitchell, 337 So.2d 1317, 1318 (Ala.1976). There being no evidence indicating that Winfred *86 did not witness Mary executing the deed, the defendants did not carry their burden of demonstrating that the first quitclaim deed was invalid as to Mary because it had been improperly witnessed.
The trial court properly could have concluded, however, that Winfred’s attestation of the first quitclaim deed was invalid as to Shirley, Robert, and Manard. Shirley and Robert both testified that no one was around them when they signed the quitclaim deed; Manard testified that Deborah and he were alone when he signed the deed. The inference that arises from the testimony of those defendants is that Winfred did not see them sign the deed, and, as a result, the trial court was free to conclude that, as to those defendants, the deed was not executed properly.
Sheila contends that the trial court erred in failing to hold that the quitclaim deeds, to the extent that they did not validly convey the disputed property to Deborah, constituted agreements on the part of the defendants to convey the disputed property to Deborah. Because we have concluded that the quitclaim deeds were invalid for any of the reasons stated by the trial court only as to Shirley, Robert, and Manard, we address this issue only as it relates to those defendants.
In Lavender v. Ball, 267 Ala. 104, 100 So.2d 331 (1958), our supreme court concluded that a written conveyance of real property, although insufficient to convey legal title, constituted a contract to convey legal title to the purported grantee and vested that individual with equitable title in the property. In that case, the purported grantor executed a document indicating an intention to convey to the purported grantee, among other things, a one-half interest in his real property. That document was neither witnessed nor acknowledged. When the purported grantee sought to enforce the conveyance, the trial court refused to do so. On appeal, our supreme court determined that the document was specifically enforceable. The court wrote:
“The trial court in its decree made a finding that the foregoing ‘is not an instrument that should be enforced in a court of equity, as to the real estate described therein.’ Although the decree does not state the basis for such finding, we gather from the parties’ oral arguments and briefs that it was considered inoperative for several reasons, viz: (1) It is neither witnessed nor acknowledged; (2) it is in the form of a bill of sale of personal property and is inadequate for a conveyance of real property; and (3) the real property is insufficiently described. The question, then, is whether the instrument, for one or more of the stated reasons, is ineffectual to pass to complainant any interest in the land. Although it is clearly inoperative to pass the legal title, we entertain the view that it is not, on its face, insufficient to furnish the basis for an equitable interest in the land.
[[Image here]]
“Code 1940, Tit. 47, § 22 [ (the predecessor to § 35^4-20, Ala.Code 1975, quoted in note 3, supra) ], provides that conveyances for the alienation of lands ‘must be attested by one witness, or, where the party cannot write, by two witnesses who are able to write, and who must write their names as witnesses.’ Section 24, Tit. 47, provides that an acknowledgment ‘operates as a compliance with the requisitions’ of Section 22 ‘upon the subject of witnesses.’ Here, as already noted, the instrument was neither witnessed nor acknowledged. Accordingly, it was inefficacious to pass the legal title. Haisten v. Ziglar, 258 Ala. 554, 556, 64 So.2d 592 [ (1953) ]; Golden v. Golden, 256 Ala. 187, 191, 54 So.2d 460 [ (1951) ]; Niehuss v. Ford, 251 Ala. 529, 531, 38 So.2d 484 [ (1949) ]. However, ‘it is an established equitable doc *87 trine that an instrument in writing, intended as a conveyance of lands, wanting in some essential element to pass the legal estate — as the attestation of a subscribing ivitness, or an acknowledgment of execution before an officer having authority to take and certify it, or a defective acknowledgment — will be regarded as an agreement to convey, and performance of it will be enforced’ in equity. Haisten v. Ziglar, supra [258 Ala. at 556, 64 So.2d at 594]. See, also, Golden v. Golden, supra; Niehuss v. Ford, supra; Lowery v. May, 213 Ala. 66, 74, 104 So. 5 [(1925)]; Bethea v. McCullough, 195 Ala. 480, 486, 70 So. 680 [ (1915) ]; Branch v. Smith, 114 Ala. 463, 468, 21 So. 423 [ (1897) ]; Roney v. Moss, 74 Ala. 390, 392 [ (1883) ]; Goodlett v. Hansell, 66 Ala. 151,159 [ (1880) ]. In the last cited case it is said that ‘a court of equity, looking beyond the forms of contracts, to the substance, and the ascertained intention of the parties, will cure the omission of a subscribing witness, and compel the conveyance of the legal estate.’ ”
Lavender, 267 Ala. at 106-07, 100 So.2d at 332-33 (emphasis added). See also Golden v. Golden, 256 Ala. 187, 191, 54 So.2d 460, 463 (1951) (“We have frequently held that when a deed purports to convey a title to real estate, is signed by grantor and delivered but not witnessed or acknowledged as required by law, it is in legal effect an agreement to execute an instrument passing legal title though it is inoperative itself to pass legal title.”); and Niehuss v. Ford, 251 Ala. 529, 531, 38 So.2d 484, 486 (1949) (‘When a deed purports to convey the title to real estate, is signed by the grantor and delivered, but not witnessed or acknowledged as required by law ..., though inoperative to pass the legal title, it is then in legal effect an agreement to execute an instrument passing the legal title.”).
In the present case, Sheila asserted in her amended complaint that the quitclaim deeds, to the extent they were not properly executed, had the legal effect of an enforceable agreement to convey the disputed property to Deborah. Thus, she requested in her amended complaint that “the defendants whose signatures on the quitclaim deeds were not properly witnessed or acknowledged by a notary be specifically ordered to execute an instrument passing legal title to the property described [i]n those quitclaim deeds” to her, as Deborah’s heir. Despite this claim in her amended complaint, the trial court did not rule on the issue whether the quitclaim deeds, to the extent they were ineffective to convey legal title to the disputed property to Deborah, constituted agreements by Shirley, Robert, and Ma-nard to convey that property that were subject to specific performance. Thus, because of its failure to do so, we will remand the cause for the trial court to consider that claim.
Based on the foregoing, we reverse the trial court’s determination that the quitclaim deeds were void as having been procured by fraud, and, with regard to Maxine, Mary, Carol, Jonathan, and Jeffery, we reverse its determination that the quitclaim deeds were not properly executed. We remand the cause for the trial court to consider whether, as to Shirley, Robert, and Manard, the first quitclaim deed is enforceable as an agreement to convey the disputed property and, following that consideration, to enter a new judgment consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.

. Amason's will devises certain real property to D.D. Amason, whom the will describes as one of Amason’s sons. There is no information provided in the record about D.D. Ama-son, and there is no indication that he was living at the time relevant to this action or that he had left heirs whose existence would impact the outcome of this appeal. In her principal appellate brief, Sheila states that D.D. Amason predeceased Amason, having died intestate and with no heirs.

. Because we conclude that the trial court erred in its finding of fraud on the part of Deborah in obtaining some of the defendants' signatures, we pretermit discussion of Sheila’s argument that the issue of fraud was not properly litigated before the trial court.

. In full, § 35-4-20 provides:
"Conveyances for the alienation of lands must be written or printed, or partly written and partly printed, on parchment or paper, and must be signed at their foot by the contracting party or his agent having a written authority; or, if he is not able to sign his name, then his name must be written for him, with the words ‘his mark' written against the same, or over it; the execution of such conveyance must be attested by one witness or, where the party cannot write, by two witnesses who are able ■ to write and who must write their names as witnesses; or, if he can write his name but does not do so and his name is written for him by another,, then the execution must be attested by two witnesses who can and do write their names.”

. We note, but find to be without merit, Sheila’s contention that the trial court applied the wrong standard to its review of the evidence when it referenced the "great weight” of the evidence rather than "clear and convincing” evidence. Our review of the trial court’s judgment leads us to conclude that the trial court was merely commenting on its view of *85 the quantum of the evidence. The trial court's judgment clearly contained findings of fact; it is this court’s duty to determine whether those findings of fact are supported by clear and convincing evidence.

. We note Jeffery’s testimony that he did not recall whether he had executed the second quitclaim deed before a notary public. That testimony, however, is not evidence demonstrating that he did not do so, only that he did not remember whether he had done so.