PER CURIAM.
Wilcox Investment Group, LLC (‘Wilcox Investment”), Foley Investment Partners, LLC (“Foley”), and Wilcox Communities, LLC (“Wilcox Communities”)[1] (hereinafter collectively referred to as “Wilcox”), appeal from a judgment of the Baldwin Circuit Court awarding P & D, LLC (“P & D”), $122,291 on P & D’s claims alleging the breach of two leases involving two condominium units formerly owned by P & D. P & D appeals the trial court’s judgment on the grounds that the damages the trial court awarded were insufficient and that the trial court erred in failing to award it attorney fees. We consolidated the appeals for the purpose of writing one opinion.
I. Facts
The genesis of this litigation is a condominium development in Foley, Alabama, known as Sea Pines of Bon Secour Condominiums (“the condo project”). The developer of the condo project was Sea Pines, LLC (“Sea Pines”). Sea Pines began to develop the condo project in September 2006; plans called for 84 residential'condominium units (21 buildings of 4 units each), a clubhouse, a pool, and other amenities. On September 15, 2006, Sea Pines executed a note with Superior Bank for a construction ánd development loan, secured by a mortgage on the land to be developed.
On September 27,2007, Sea Pines filed a “Declaration of Condominium of Sea Pines at Bon Secour, A Condominium” (“the declaration”), in the Baldwin probate office in accordance with the Alabama Uniform Condominium Act, Ala. Code 1975, §§ 35-8A-101 - 35-8A-417 (“the AUCA”). The declaration included core aspects of the condo project such as the plans and plats, the condominium association’s bylaws, and special rights reserved to Sea Pines as the developer of the condo project.
The AUCA provides, in part:
“(a) The declaration for a condominium must contain:
[[Image here]]
■ “(8) A description of any development rights specified in Section 35-8A-103(11) and other special declarant rights- specified in Section 35-8A-103(24) reserved by the declarant, together with a legally sufficient description of the’real estate to which each of those rights applies, and. a time limit within which each of those rights must be exercised....”
§ 35-8A-205(a)(8), Ala. Code 1975 (emphasis added). The AUCA defines “special de-clarant rights” as
“[rjights reserved for the benefit of a declarant (i) to complete improvements indicated on-plats and plans filed with the declaration (Section 35-8A-209); (ii) to exercise any development right (Section 35-8A-210); (iii) to maintain sales offices, management offices, signs advertising the condominium, and models (Section 35-8A-215); (iv) to use 'easements through the common elements for the purpose of making improvements within the condominium or within real estate which may be added to the condominium (Section 35-8A-216); (v) to make the condominium subject to a master *905 association (Section 35-8A-220); (vi) or to appoint or remove any officer of the association or any master association or any board member during any period of declarant control (Section 35-8A-303(d)).”
§ 35-8A-103(24), Ala. Code 1975 (emphasis added). Section 35-8A-215, Ala. Code 1975, provides, in part:
“A declarant may maintain sales offices, management offices, and models in units or on common elements in the condominium only if the declaration so provides and specifies the rights of a declar-ant with regard to the number, size, location, and relocation thereof. Any sales office, management office, or model not designated a unit by the declaration is a common element, and if a de-clarant ceases to be a unit owner, he ceases to have any rights with regard thereto unless it is removed promptly from the condominium in accordance with a right to remove reserved in the declaration. ...”
(Emphasis added.) The Commissioner’s Commentary 1 to § 215 further explains:
“This section prescribes the circumstances under which portions of the condominium—either units or common elements—may be used for sales offices, management offices, or models. The basic requirement is that the declarant must describe his right to maintain such offices in the declaration. There are no limitations on that right, so that either units owned by the declarant or other persons, or the common elements themselves, may be used for that purpose. ...”
(Emphasis added.)
The declaration defines “ ‘Developer’ or ‘Declarant’ ” as “Sea Pines, LLC, an Alabama limited liability company, and its successors and assigns.” § 2.01(M). Section 5.02 of the declaration provides:
“Use for Sales Purposes. All Units and the Common Elements shall be subject to the statutory right concerning sales and management offices and models in Units and the Common Elements in favor of the Developer allowed by § 35-8A-215 of the [AUCA]. The Developer otherwise expressly reserves the right to use one (1) or more Units owned by the Developer for management offices and/or sales and leasing offices. The Developer reserves the right to relocate offices and/or models from time to time within the Property. The Developer further reserves the right to maintain on the Common Elements advertising signs in any location or locations and from time to time to relocate and/or remove the same, all in the sole discretion of the Developer.”
(Emphasis added.) Thus, in accordance with provisions of the AUCA and the declaration, among the special declarant rights possessed by Sea Pines was the right to maintain models in units of the condo project.
By October 2007, Sea Pines had built the clubhouse and one building of condominiums consisting of four units. To get more money released from its construction loan, Sea Pines needed to sell at least two of those units. Patty Lee, a licensed realtor, was the exclusive listing agent for the condo project. Keith Clay, Sea Pines’ managing agent, made a proposal to Lee that she in turn shared with Dave Wirtes, an attorney,[2] for the sale of two units, *906 which would mutually benefit Sea Pines and Lee and Wirtes. The proposal involved Sea Pines selling two units to Lee and Wirtes contingent upon Lee and Wirtes leasing the units back to Sea Pines to use as sales models. Wirtes testified that Clay represented the deal as one in which “there would be no money out of [Wirtes’s] pocket” and “[at] the end of the buildout of Phase I [of the condo project] I would own the two units outright,”[3]
To this end, Lee and Wirtes formed P & D. On October 28, 2007, P & D executed purchase agreements with Sea Pines for the purchase of unit 103 for $282,160 and unit 104 for $257,771. P & D financed the purchases through First National Bank of Baldwin County. On the same day, Sea Pines executed lease agreements with P & D in which P & D agreed to lease to Sea Pines unit 103 for $2,200 per month and unit 104 for $2,100 per month on the condition that Sea Pines “shall use the premises as a model home for real estate purposes.” The leases stated that they would terminate on “November 9, 2009, or sale by Sea Pines, ■ LLC, of final unit of Phase I of project known as Sea Pines at Bon Secour, whichever is later.”[4] The final paragraph of each of the leases (“paragraph 10”) provided:
“10. In the event Sea Pines, LLC, its members, successors and assigns elect for any reason not to complete construction of all presently planned units of Phase I of Sea Pines at Bon Secour, Sea Pines, LLC, its members, successors or assigns shall, at the election of P & D, LLC, either a) satisfy all remaining indebtedness owed at that time by P & D, LLC, to First National Bank of Baldwin County (or its successors or assigns) for the purchase price of the condominium unit that is the subject of this lease agreement; or b) purchase from P & D, LLC, the condominium unit that is the subject of this lease agreement for the sum represented by the last most recent appraisal of the unit.”
On November 16, 2007, Superior Bank issued a “Partial Release” from its lien on the condo project for units 103 and 104. On June 8, 2009, the leases were recorded in the Baldwin probate office.
On August 31, 2011, P & D sent Sea Pines a letter contending that Sea Pines had breached the leases because of a “failure to complete construction of all presently planned units of Phase I of [the condo project].” According to P & D, nearly four years after execution of the lease agreements, Sea Pines had built only 3 of the 21 condominium-unit buildings. In the letter, P & D formally invoked the remedy of paragraph 10, asking Sea Pines to “satisfy all remaining indebtedness owed ... by P & D, LLC, to First National Bank of Baldwin County.”
On September 7, 2011, Sea Pines responded by letter to P & D’s demand, stating that it “has no available cash from which to acquire the units or assume the debt.” Sea Pines noted that it had
*907 “not had any recent sales of units in the development. Sea Pines, LLC’s agreement with its lender is that it can construct new units but only as existing ones are sold. ... [T]he market for units such as these has been extremely depressed and Sea Pines, LLC certainly hopes that conditions will improve at some point so that development can continue and will make economic sense.”
Despite Sea Pines’ response, it continued to pay rent to P & D on units 103 and 104 through January 2013.
Cadence Bank, the successor of Superior Bank, ultimately declared Sea Pines to be in default on the note secured by the mortgage on the condo project. On February 8, 2013, Cadence Bank conducted a foreclosure sale of the condo project; the condo project was sold to Wilcox Investment for $685,654. The foreclosure deed expressly excluded from the sale the six units that Sea Pines previously had sold, including units 103 and 104.
On March 20, 2013, P &D forwarded to Wilcox Investment the leases between Sea Pines and P & D. P & D demanded that Wilcox Investment assume the obligation under the leases of paying rent to P & D. On April 9, 2013, Wilcox Investment responded to the demand: It denied that it had any obligation under the leases, and it refused to pay rent to P & D. P & D subsequently demanded that Wilcox Investment pay off P & D’s debt in accordance with paragraph 10. Wilcox Investment refused this demand as well.
On May 16, 2013, Wilcox Investment conveyed its interest in the condo project to Foley. Both Wilcox Investment and Foley are owned by the same parties. On December 29, 2014, Foley filed a “Fourth Amendment to the Declaration of Condominium” for the condo project. In this document, Foley acknowledged that “Cadence Bank ... transferred the special declarant rights set forth in the Declaration to Wilcox Investment Group, LLC, by that said Mortgage Foreclosure Deed.” It further noted that “Wilcox Investment Group, LLC, transferred the special de-clarant rights to Foley .... ” The document stated that the purpose of the amendment to the declaration was that Foley “desires to exercise its special de-clarant rights under Article 5.04 of the Declaration to contribute another additional phase to the Condominium.”
P & D asserts that because neither Wilcox Investment nor Foley made any rental payments to P & D, it became difficult to pay the $5,000 per month required tb service P & D’s mortgage debt, and so it placed units 103 and 104 for sale. On October 11, 2013, P & D sold unit 103 for $175,000. On October 22, 2013, it sold unit 104 for $162,500. Following the sales, P & D was left with an unpaid balance on its note of $119,000.
Foley permitted the escrowing of unpaid condominium fees on units 103 and 104 so that the sales on those units could close. After closing, P & D declined to release the escrowed fees to the Sea Pines Condominium Association, Inc. (“the Association”).
On February 27, 2014, Fairhope Title Services, LLC (“Fairhope Title”), filed an interpleader action in the Baldwin Circuit Court against P & D, Wilcox Investment, Foley, and the Association, in an effort to determine whether P & D owed the Association $4,340 in condominium fees. On March 3, 2014, P & D filed its answer to the complaint denying that it was obligated to pay the condominium fees to the Association; P & D also filed a cross-claim against Wilcox Investment and Foley and a third-party complaint against Wilcox Communities. Among other things, P & D sought damages from Wilcox for the al *908 leged breach of the leases on units 103 and 104.
On April 14, 2014, Wilcox Communities filed a motion to dismiss the P & D action and Wilcox Investment and Foley answered P & D’s cross-claim. On September 22, 2014, the trial court dismissed without prejudice P & D’s cross-claim and third-party complaint with leave to allow P & D to refile its claims as a separate action. On September 23,2014, P & D filed a separate action asserting the same claims against Wilcox.
The trial court held a combined bench trial of Fairhope Title’s interpleader action and P <& D’s separate action. At the conclusion of P & D’s case, Wilcox moved for a judgment as a matter of law on P & D’s claim alleging breach of the leases; the trial court denied the motion, .
On Juné 24,2015, the trial court issued a single decision for both the interpleader action and P & D’s action. The trial court entered a judgment in favor of the Association and against P & D for $4,300 in the interpleader action because it found that P & D “as owner[] [of units 103 and 104], [is] liable for the established monthly [condominium] dues.” With regard to P & D’s action, the trial court entered a judgment in favor of P & D and against Wilcox jointly and severally, finding that Wilcox had breached the leases by not assuming Sea Pines’ rent obligation to P & D. The trial court reasoned that under the AUCA the leases were included in the special declarant rights Wilcox Investment had obtained in the foreclosure sale on the condo project and that, therefore, Wilcox was required to meét the obligation of paying rent to P & D. Instead of awarding P & D back rent, however, the trial court concluded that, because P & D had sold the condo units, “the most reasonable'outcome under the given facts” was to have Wilcox pay off P & D’s remaining debt. Accordingly, the, trial court awarded P & Í) damages “of $122,291.00 for the remaining. mortgage balances on unit 103 and 104.”
P & D filed postjudgment motions in which it requested that the trial court vacate the judgment against it in the inter-pleader action, requested an award of attorney fees and costs in P & D’s action, and requested that the trial court amend the judgment in its favor in the P & D action to include $33,120 in back rent and $406,763 in contract damages based on what it claimed to be the fair market value of units 103 and 104.
Wilcox filed a postjudgment motion in P & D’s action in which it requested that the trial court vacate the judgment against Wilcox Communities because it was a nonexistent entity that had never been served with process.
The Association filed a postjudgment motion in the interpleader action in which it sought attorney fees and costs.
In its postjudgment order, the trial court awarded the Association all costs but only nominal attorney fees. It awarded P& D costs in P & D’s action, but it denied P & D’s request for attorney fees. The trial court denied Wilcox’s request that it vacate the judgment against Wilcox Communities,[5] and it denied P & D’s request for an amended judgment as to the amount of its recovery in P & D’s action.
On October 8, 2015, the Association and Wilcox filed notices of appeal in the inter-pleader action and P & D’s- action, respectively. The Association has elected, however, not to further pursue its appeal of the trial court’s denial in part of its request for attorney fees in the interpleader action. On October 15, 2015, P & D filed a cross-appeal in P & D’s action. Accordingly, the *909 only parties in this consolidated appeal are Wilcox and P & D, and the parties’ arguments concern only the trial court’s judgment in P & D’s action.
II. Standard of Review
The trial court heard ore tenus evidence during a bench trial. Ordinarily, “ “[w]hen a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.” ’ ” Kennedy v. Boles Invs., Inc., 53 So.3d 60, 67-68 (Ala.2010) (quoting Smith v. Muchia, 854 So.2d 85, 92 (Ala.2003), quoting in turn Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996)). In this case, however, the trial court’s judgment relied on its interpretation of the AUCA, not upon a disputed question of fact. ‘“This court reviews de novo a trial court’s interpretation of a statute, because only a question of law is presented.’” Continental Nat’l Indem. Co. v. Fields, 926 So.2d 1033, 1034-35 (Ala.2005) (quoting Scott Bridge Co. v. Wright, 883 So.2d 1221, 1223 (Ala. 2003)). Furthermore, “no presumption of correctness exists as to a trial court’s judgment when the trial, court misapplies the law to the facts.” Brown v. Childress, 898 So.2d 786, 788 (Ala.Civ.App.2004). The trial court’s assessment of damages was made following the submission of conflicting evidence; therefore, ‘“[t]he ore tenus standard of review extends to the trial court’s assessment of damages.’” Kennedy, 53 So.3d at 68 (quoting Edwards v. Valentine, 926 So.2d 315, 325 (Ala.2005)).
III. Analysis
A. Liability Under the AUCA
The trial court concluded that “the Lease Agreements are related to the Declaration and are obligations imposed by the AUCA” against Wilcox. The trial court explained that, according to § 35-8A-103(24), Ala. Code 1975, using condominium units as sales models is a “special declarant right.” Section 35-8A-215 specifically requires that the model-home special declarant right must be stated in the declaration, which § 5.02 of the declaration fulfills by stating that “[a]ll Units ... shall be subject to the statutory right concerning ... models in Units ... in favor of the Developer allowed by § 35-8A-215 of the [AUCA].” Commissioner’s Commentary 14, discussing the definition of “special de-clarant rights”.in § 35-8A-103, states that “the concept of special declarant rights triggers the imposition of obligations on those who possess the rights.” More specifically, the trial court emphasized, § 35-8A-304(e), which addresses “[t]he liabilities and obligations of a person who succeeds to special declarant rights,” provides in subpart (2)a. that “[a] successor to any special declarant right, .., who is not an affiliate of a declarant, is subject to all obligations and liabilities imposed by this chapter or the declaration .,. [o]n a de-clarant which relates to his exercise" or nonexercise of special declarant rights.” The trial court observed that,
“[u]nder § 35-8A-304(c), an individual that acquires title to real estate being foreclosed succeeds to all special declar-ant rights related to that real estate held by the declarant. Thus, by virtue of the foreclosure sale, Wilcox [Investment] succeeded to all the' special declarant rights of Sea Pines related to the real estate held by Sea Pines.”[6]
Finally, the trial court noted that Commissioner’s Commentary 1 to § 35-8A-215 ob *910 serves that “[t]here are no limitations on that right [to maintain units as models], so that either units owned by the declarant or other persons ... may be used for that purpose.” Putting all of this together, the trial court reasoned:
“This statutory right to use the units of other owners as model homes indicates that declarants can enter into a contract to lease units for the purpose of exercising that right. Thus, a lease that a de-clarant enters into with a unit owner—to rent their unit for the purpose of maintaining a model home—is an obligation arising under the AUCA and the Declaration. As such, both P & D and Wilcox are bound by the obligations of these Lease Agreements.”
Wilcox agrees that the right to maintain model homes in condominium units is a special declarant right reserved in the declaration and that Wilcox Investment succeeded to this and other special declarant rights when it purchased the condo project in the foreclosure sale. Wilcox argues, however, that “the mere existence of a special declarant right that the original developer here chose to exercise through the Leases does not transform the Leases into obligations either ’imposed by or ’arising under’ the AUCA for [Wilcox] as successor declarants.” We agree.
It is true that Sea Pines’ right as the declarant to maintain one or more model condominium units—as against the right of the condominium owners generally to the peaceful enjoyment of their own condominiums and the common areas—derives from the AUCA and the declaration. But this right under the declaration as against condominium owners in general is merely a right to use such condominium unit or units in which Sea Pines, by virtue of its retained ownership or by lease or other contract, otherwise might at a given time have a possessory interest. The right to acquire such a possessory interest in any given unit is not granted to the declarant by the AUCA or any associated declaration. Nothing in the declaration sets apart units 103 and 104 for some sort of special use by the declarant as model units. Because Sea Pines had sold units 103 and 104, to acquire a possessory right in those units (in order to be in a position to use those particular units for the exercise of the special right under the declaration to operate models), it was necessary for Sea Pines to acquire that right by way of a lease or similar contract or conveyance from the owner of those units, which of course was P & D. Thus it was that Sea Pines entered into leases with P & D. The right of Sea Pines to use P & D’s units, as against the possessory rights of P & D as their owner, derived strictly from these leases Sea Pines chose to enter into with P & D. And more importantly, Sea Pines’ corollary obligation to pay rent to P & D as consideration for its right to possess those units was solely a function of those same leases, not of the AUCA and/or the declaration.
Sea Pines’ transfer of its special declar-ant rights to Wilcox Investment did not transfer its obligation to pay rent to P & D, because that obligation was never imposed on Sea Pines through the AUCA or the declaration but through the separate lease agreements. Viewed from Wilcox’s perspective, the matter may be put as this: *911 As the purchaser of Sea Pines’ property at foreclosure, Wilcox Investment became the successor to special declarant rights and obligations pertaining to the property it purchased. But Wilcox Investment did not assume Sea Pines’ separate obligation to pay rent under leases of additional property not owned by Sea Pines at the time of foreclosure and not purchased by Wilcox Investment as part of the foreclosure sale.
B. Liability Under the Leases Apart from the AUCA
Although the trial court did not adopt the argument, P & D reiterates a contention it made to the trial court that Wilcox is bound to the leases by the terms of the leases themselves apart from the provisions of the AUCA. P & D notes that paragraph 10 provides that, “[i]n the event Sea Pines, LLC, its members, successors and assigns elect for any reason not to complete construction of all presently planned units of Phase I of Sea Pines at Bon Secour, Sea Pines, LLC, its members, successors or assigns shall, at the election of P & D, LLC, either” satisfy P & D’s remaining indebtedness for units 103 and 104 or purchase units 103 and 104 from P & D for fair market value. (Emphasis added.) P <& D contends that, “[a]s subsequent developers who acquired special declarant rights, Wilcox [Investment] and Foley cannot avoid their, status as ‘successors’ and/or ‘assigns’ of Sea Pines within - the meaning of those terms in the Lease Agreements.” P & D insists that “the language [in the leases] was intended to bind subsequent developers who purchased the condominium development.
The basic problem with this argument is that the intent of the leases is to trigger a payment obligation by the lessee, or its successors or assigns as lessee, in the event Phase I of the project is not completed. Under the terms of the leases, if the developer, or its successor and assigns as developer, fails to complete the condominium project, then the requirement in the lease for a payoff of certain indebtedness of P <& D is triggered. But the obligation to make that payment is that of Sea Pines in its capacity as lessee (barring of course an assignment of the lease itself by Sea Pines to a successor lessee, which has not happened). There is no basis for concluding that Wilcox is an assignee or a successor to Sea Pines in its capacity as lessee under the leases. Just because Wilcox Investment was a “successor declar-ant” under the AUCA does not render Wilcox a “successor” to Sea Pines under the leases.
The Appellate Court of Illinois in Lake Homeowners Ass’n v. Bank of Ravenswood, 295 Ill.App.3d 131, 692 N.E.2d 402, 229 Ill.Dec. 629 (1998), did conclude that a successor developer that purchased planned-unit-community , property in a foreclosure sale was an “assignee” and a “successor” of the original developer, but the decision concerned the subsequent developer’s right to develop the property under the declaration of the condominium and under the Illinois Condominium Act. It did not involve whether the subsequent developer was an assignee under a separate contract. The Bank of Ravenswood court’s conclusion that the subsequent developer was a “successor” to the original developer was based on the principle that, “[i]n a foreclosure proceeding, the purchaser of the collateral at the public sale takes title to the property subject to all prior liens and encumbrances.” 295 Ill.App.3d at 137, 692 N.E.2d at 406, 299 Ill.Dec. at 633. As we already have noted, however, units 103 and 104 were expressly excluded from Wilcox Investment’s purchase of the condo project in the foreclosure sale. Consequently, the property *912 Wilcox Investment purchased was not encumbered by the leases.[7]
P & D also cites Alabama cases in which this Court determined that the purchaser of a lessor’s interest in real property during the unexpired term of a lease was substituted as the lessor with “all the rights of the original lessor.” Plastone Plastic Co. v. Whitman-Webb Realty Co., 278 Ala. 95, 97, 176 So.2d 27, 28 (1965), Plastone Plastic is no help to P & D, though, because in that case the Court noted that it was undisputed that the purchaser was a successor of the original lessor. 278 Ala. at 97-98, 176 So.2d at 29. Moreover,, the purchaser was aware of the lease and assumed duties as the lessor following the purchase of the real estate.
P & D also cites Texas Co. v. Birmingham Southern College, 239 Ala. 158, 194 So. 192 (1940). In Texas Company, the question was whether a mortgagee was bound by the terms of a lease when the mortgagee foreclosed on the property of the lessor. The mortgagee argued that because her mortgage preceded the lease, she “did not by virtue of the foreclosure of the. mortgage and the purchase of the property’ at the sale, in and of these facts alone, create the relationship of landlord and tenant between the [lessee] and the [mortgagee].” 239 Ala. at 161, 194 So. at 194. The Court agreed with the mortgagee’s general point of law, but it stated that the particular facts of the. case removed it from the application'of that general rule. Specifically, the Court noted that, although a lease provision that stated that the agreement “was not only binding upon the parties but upon their respective successors .or assigns,” “without -more,, was not binding upon the mortgagee,” the lease also contained a clause that stated: “T, as mortgagee,, give my approval to this lease, without waiving any, rights held under first mortgage, but subject to such mortgage,”’ which was followed by the signature of the mortgagee. Id. The Court determined that the latter clause with,the mortgagee’s signature constituted consent that she would become “the successor” to the lessor if she foreclosed on the mortgage. Id. We have no such similar express acceptance by Wilcox Investment of responsibility for the leases when it purchased the condo project at the foreclosure sale.
The import of P & D’s argument that Wilcox'is a “successor” or “assign” under the leases' is that general rules of corporate and contract law do not apply in this situation. But § 35-8A-108, Ala. Code 1975, expressly provides:
“The principles of law and equity, including the law of corporations, the law of real property and the law relative to capacity to contract, principal and agent, eminent domain, estoppel, fraud, misrepresentation, duress, coercion, mistake, receivership, substantial performance, or other validating or invalidating cause supplement the provisions of this chapter, except to the extent inconsistent with this chapter.”
(Emphasis added.) According to those principles of law, Wilcox clearly is not an “assignee” or “successor” of Sea Pines under the leases. .Therefore, Wilcox is not *913 liable on the obligation to pay rent under the leases on the basis of paragraph 10.
IV. Conclusion
Based on the foregoing, we conclude that Wilcox was not bound by the leases, and it therefore cannot be held liable for a refusal to pay rent under the leases. The trial court erred in concluding otherwise. This result pretermits any need to discuss Wilcox’s argument that the trial court awarded P & D a remedy to which it was not entitled under the leases. Oür decision also moots the issues presented by P & D’s cross-appeal as to whether the trial court erred in failing to award P & D: (1) past-due rent; (2) the actual value of the two units lost as a consequence of the alleged breach of the leases; and (3) attorney fees. In sum, the trial court’s judgment against Wilcox is reversed and P & D’s cross-appeal is dismissed.
1150025—REVERSED AND REMANDED.
1150052—APPEAL DISMISSED.
Stuart, Parker, Murdock, Shaw, Main, and Wise, JJ., concur.
Bryan, J., dissents.

. This entity is identified in the complaint as Wilcox Communities, an EPCON Communi-ües Builder.

. Wirtes had been Lee's attorney in a wrongful-death action filed following the death of Lee’s husband.

. Wirtes explained:
"I mean, frankly, I was footing the financial side of it in an effort to help Patty. Patty was working on commission at Roberts Brothers at Sea Pines. So when units would be sold, she would garner income but I was the one taking the risk principally on the personal guarantees [for the loans P & D secured to purchase the condominium units].”

. Wirtes testified that "Phase I” in the leases referred to all 21 buildings of condominium units. He further explained that "the Sea Pines principals had an option to purchase an adjacent 40 acres and it was their hope and expectation that they would quickly sell these and then go on and essentially do another mirror development in Phase 2 but, of course, that never happened.”

. Wilcox .does not contest this issue in its appeal,

. Section 35-8A-304(c), Ala. Code 1975, provides, in part:
“Unless otherwise provided in a mortgage instrument or deed of trust or other agreement creating a security" interest, in case of *910 foreclosure of a security interest, ... of any units owned by a declarant or real estate in a condominium subject to development rights, a person acquiring title to all the real estate being foreclosed or sold succeeds to all special declarant rights related to that real estate held by that declarant, or only to any rights reserved in the declaration pursuant to Section 35-8A-215 and held by that declarant to maintain models, sales offices and signs.”

. Similarly, in Meritage Homes of Arizona, Inc. v. Weston Ranch Property Owners Ass’n, Inc., (No. 1 CA-CV 11-0373) (Ariz.Ct.App. 2012) (not reported in P,3d), the question was whether a subsequent developer had been "assigned” the original developer’s declarant rights, including the right to appoint board members to the condominium community’s board of directors, when it purchased 51 of the 55 lots in the community in' a trustee's sale that followed the bankruptcy of the original developer. Neither Bank of Ravenswood nor Meritage Homes concerned whether the subsequent developers acquired contractual obligations of their predecessor developers.